**MONTEREY COAL COMPANY,**
Petitioner,

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, and Raymond J. Donovan, Secretary of Labor, Respondents,**

**United Mine Workers of America,**
Intervenor-Respondent.

No. 83–2651.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1984.

Decided Sept. 14, 1984.

Stuart Dobbs, Springfield, Ill., for petitioner.

Anna L. Wolgast, Dept. of Labor, Arlington, Va., for respondents.

Mary Lu Jordan, United Mine Workers of America, Washington, D.C., for intervenor-respondent.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

The sole issue in this appeal is whether section 103(f) of the Federal Mine Safety and Health Amendments of 1977, 30 U.S.C. § 813(f), requires mine operators to pay wages to a miner representative accompanying a federal mine inspector conducting a "spot" mine inspection. In *United Mine Workers v. Federal Mine Safety and Health Review Commission*, 671 F.2d 615 (D.C.Cir.) *("United Mine Workers")*, cert. denied, 459 U.S. 927, 103 S.Ct. 239, 74 L.Ed.2d 189 (1982), a divided panel of the Court of Appeals for the District of Columbia Circuit held that section 103(f) does require such "walkaround pay" for spot inspections. Petitioner Monterey Coal Company has invited us to disagree with the District of Columbia Circuit on this issue. We decline the invitation and affirm the decision of the Federal Mine Safety and Health Review Commission.[1]

I

Under the prior law governing mine safety, section 103(h) of the federal Coal Mine Health and Safety Act of 1969, an authorized representative of miners was entitled to accompany a federal mine inspector on any mine inspection. 30 U.S.C. § 813(h) (1976). In enacting the Mine Safety and Health Act of 1977 ("the Act"), Congress overhauled prior mine safety legislation. Among the Act's new provisions was section 103(f), 30 U.S.C. § 813(f) (1982). That subsection not only authorizes miner representatives to accompany federal inspectors but also requires mine operators to pay the wages of one miner representative accompanying the inspector. At issue here is the scope of these rights to accompany federal mine inspectors ("participation rights") and to be paid for the time spent on the inspection ("walkaround pay rights").

Section 103(a) of the Act, 30 U.S.C. § 813(a), gives the Secretary of Labor the authority to inspect mines frequently for safety-related purposes, and subsection (a) specifically requires the Secretary to inspect in their entirety all underground mines four times a year and all surface mines two times a year. Section 103(f) of the Act, 30 U.S.C. § 813(f), provides that a miner representative must be given an opportunity to accompany a federal mine inspector "during the physical inspection of any coal or other mine made pursuant to the provisions of subsection (a)." Subsection (f) also provides that, where the miner representative is an employee of the mine operator, the representative "shall suffer no loss of pay during the period of his participation in the inspection made under this subsection." This pay for time spent accompanying mine inspectors is generally known as "walkaround pay," and we shall use that term.

Petitioner Monterey Coal Company ("Monterey Coal") argues that a miner representative is entitled to walkaround pay only for the four inspections per year required by subsection (a) for underground mines. The Secretary of Labor and intervenor United Mine Workers argue that the walkaround pay rights extend to virtually all mine inspections.

The facts here are very simple. On March 23, 1982, an inspector from the federal Mine Safety & Health Administration ("MSHA") conducted a spot roof control inspection of Monterey No. 1 Mine, an underground coal mine in Carlinville, Illinois.[2]

---

1. After oral argument in this case, the Third Circuit issued a unanimous decision in accord with *United Mine Workers. Consolidation Coal Co. v. Federal Mine Safety and Health Review Commission,* 740 F.2d 271 (3d Cir.1984).

2. The Act does not use the terms "spot inspections" and "regular inspections." However, the mining industry now appears to describe as "regular inspections" the inspections of entire mines mandated by section 103(a)—four inspec-

A miner representative accompanied the inspector during the inspection, but Monterey Coal failed to pay him for the time spent accompanying the inspector. On April 28, 1982, the MSHA cited Monterey Coal for a violation of section 103(f) of the Act. Monterey Coal contested the citation, and the United Mine Workers of America intervened. An administrative law judge upheld the citation and assessed a civil penalty of twenty dollars. *Secretary of Labor v. Monterey Coal Co.*, 5 FMSHRC 1223, 3 MSHC (BNA) 1030 (1983).[3] The Commission declined review, and Monterey Coal then petitioned this court for review. *See* 30 U.S.C. § 816(a)(1).

## II

In support of its contention that walkaround pay rights under section 103(f) apply only to the regular inspections mandated by section 103(a), Monterey Coal makes arguments based on the language of section 103(f) and on remarks of one Member of Congress during the floor debate before final passage of the Act. We consider these arguments in turn.

### A. Inspections "Pursuant to the Provisions of Subsection (a)."

The sentence of section 103(f) describing the situations in which a miner representa-

tive is entitled to accompany the inspector uses the language: "during the physical inspection of any coal or other mine made pursuant to the provisions of subsection (a)." 30 U.S.C. § 813(f).[4] The sentence providing walkaround pay rights says that the miner representative shall suffer no loss of pay during "the period of his participation in the inspection made under this subsection." *Id.* Monterey Coal focuses on the phrase "pursuant to the provisions of subsection (a)" and argues that that phrase should be given a limiting reading. According to Monterey Coal, the phrase refers, at least for purposes of walkaround pay rights, only to the regular inspections of an entire mine *mandated* by subsection (a). Invoking the familiar proscription against statutory surplusage, petitioner argues that any broader interpretation would render meaningless the phrase "pursuant to the provisions of subsection (a)." Petitioner contends that Congress deliberately did not use the phrase "any inspection" in section 103(f) because it did not want walkaround pay rights to apply to all mine inspections.

Consideration of this straightforward "surplusage" argument is complicated by the relationship between the miner representative's participation rights and the representative's right to suffer no loss of pay.

tions per year for underground mines and two per year for surface mines. The term "spot inspections" refers to other mine inspections more limited in scope and purpose. *See* 43 Fed.Reg. 17547 (1978).

**3.** Shortly after the citation was issued, Monterey Coal paid the miner representative and thus abated the violation.

**4.** *Section 103(f) of the Act provides in full:*

(f) Participation of representatives of operators and miners in inspections

Subject to regulations issued by the Secretary, a representative of the operator and a representative authorized by his miners shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any coal or other mine made pursuant to the provisions of subsection (a) of this section, for the purpose of aiding such inspection and to participate in pre- or post-inspection conferences

held at the mine. Where there is no authorized miner representative, the Secretary or his authorized representative shall consult with a reasonable number of miners concerning matters of health and safety in such mine. Such representative of miners who is also an employee of the operator shall suffer no loss of pay during the period of his participation in the inspection made under this subsection. To the extent that the Secretary or authorized representative of the Secretary determines that more than one representative from each party would further aid the inspection, he can permit each party to have an equal number of such additional representatives. However, only one such representative of miners who is an employee of the operator shall be entitled to suffer no loss of pay during the period of such participation under the provisions of this subsection. Compliance with this subsection shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter. 30 U.S.C. § 813(f).

The phrase which petitioner argues must be read narrowly, inspections "made pursuant to the provisions of subsection (a)," defines the miner representative's participation rights. The walkaround pay provision merely incorporates this phrase indirectly by saying that the miner representative shall suffer no loss of pay for his "participation in the inspection made under this subsection." Thus, the scope of walkaround pay rights is, as a textual matter, closely intertwined with, if not identical to, the scope of participation rights.

Petitioner tells us that the scope of the miner representative's right to accompany the inspector is not an issue here. Petitioner's Brief at 3. Strictly speaking, petitioner is correct, since the only claimed violation of the Act here is petitioner's refusal to pay a miner representative who was permitted to accompany an inspector. Nevertheless, all but one of petitioner's arguments based on the phrase, "pursuant to the provisions of subsection (a)," apply equally to both participation rights and walkaround pay rights.[5] If we were to rely solely on that phrase to limit walkaround pay rights, we would in effect also limit the right to accompany the mine inspector to the four annual regular inspections of underground mines.

We agree with the District of Columbia Circuit that the phrase "pursuant to the provision of subsection (a)" is ambiguous. *United Mine Workers,* 671 F.2d at 623; *id.* at 631–32 (Tamm, J., dissenting). Congress did not use the phrase *"any* inspection," nor did it use the phrase "inspections *required* under subsection (a)." The phrase Congress did use is arguably subject to two interpretations.

In the face of that ambiguity, we also agree with the District of Columbia Circuit's conclusion that the better reading of the phrase is that the Secretary makes any physical inspection of a mine "pursuant to the provisions of subsection (a)," at least for purposes of participation rights. *See United Mine Workers,* 671 F.2d at 623–27.[6] Subsection (a) provides the general authority for all physical inspections of mines. Subsection (a) directs the Secretary to make "frequent inspections and investigations in coal or other mines" for specified purposes which include "(3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or other requirements of this Act."[7] There are

---

5. The exception is the argument based on the remarks of Representative Carl Perkins before the final House vote on the Act. We discuss that argument below.

6. Judge Tamm, dissenting in *United Mine Workers,* agreed that a miner representative is entitled to accompany the inspector during any inspection. 671 F.2d at 629.

7. Section 103(a) of the Act provides in full:
 (a) Purposes; advance notice; frequency; guidelines; right of access
 Authorized representatives of the Secretary or the Secretary of Health and Human Services shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with

the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person, except that in carrying out the requirements of clauses (1) and (2) of this subsection, the Secretary of Health and Human Services may give advance notice of inspections. In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year. The Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws. For the purpose of making any inspection or investigation under this chapter, the Secretary, or the Secretary of Health and Human Services, with respect to fulfilling his responsibilities under this chapter, or any au-

only three other provisions in the act authorizing inspections. A later sentence in subsection (a) orders the Secretary to inspect "each underground coal or other mine in its entirety at least four times a year" and "each surface coal or other mine in its entirety at least two times a year." Also, section 103(i) requires a special pattern of very frequent inspections in mines with excessive gas or with other especially hazardous conditions, and section 103(g)(1) gives miners a right to demand an immediate inspection on written request to the Secretary.

■ It is clear that the spot roof control inspection involved in this case was authorized *only* by subsection (a). The other specific inspection provisions do not cover this situation, and petitioner does not attempt to argue that the inspection was beyond the government's authority. The spot inspection here was thus made "pursuant to the provisions of subsection (a)." Even inspections covered by other express provisions—inspections at the request of a miner under subsection (g)(1) and inspections of especially dangerous mines under subsection (i)—are also authorized by subsection (a), for surely there can be little doubt that, even without those specific provisions, the government could frequently inspect especially hazardous mines and inspect mines in response to miners' requests.[8]

Finally, the legislative history of the Act shows that it is highly unlikely that Congress meant to limit the right of the miner representative to *participate* in inspections. As noted, under the prior law regarding coal mine safety, a miner representative had the right to accompany the inspector on *any* coal mine inspection. 30 U.S.C. § 813(h) (1976). The prior law did not, however, provide any walkaround pay rights. In describing the changes of the new Act, the Senate and conference reports on the 1977 Act pointed out the new walkaround pay provisions and stressed the importance of those pay provisions in ensuring miner participation in safety matters. S.Rep. No. 181, 95th Cong., 1st Sess. 28–29, 1977 U.S. Code Cong. & Admin. News at 3401, *reprinted in* Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977 at 616–17 (Comm.Print 1978) [hereinafter "Legislative History"]; S.Conf.Rep. No. 461, 95th Cong., 1st Sess. 45 (1977), *reprinted in* Legislative History at 1323. The floor debate in the Senate on a proposed floor amendment to eliminate the walkaround pay provisions also emphasized the need for walkaround pay to provide for effective miner participation in inspections. 123 Cong.Rec. 20019–20 (1977) (remarks of Senators Javits and Helms), *reprinted in* Legislative History at 1053–56. Nothing in the legislative history indicates any intent to restrict the pre-existing right under the Coal Act to accompany the inspector on "any inspection." There is thus no indication in the legislative history that Congress might have used the phrase "pursuant to the provisions of subsection (a)" to restrict the right to only a few inspections. Instead, the use of the phrase appears to have been merely a result of the drafters' borrowing of language from parallel provi-

---

thorized representative of the Secretary or the Secretary of Health and Human Services, shall have a right of entry to, upon, or through any coal or other mine. 30 U.S.C. § 813(a).

**8.** Additional support for the contention that all physical inspections of mines are conducted pursuant to subsection (a) stems from the Supreme Court's decision in *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). The Court there upheld the section 103(a) provisions for warrantless mine inspec-

tions, including the spot inspection in that case. The only statutory authority for the Secretary to inspect mines without a warrant or prior notice is section 103(a). That fact suggests that any inspection—such as the spot inspection in this case—lawfully conducted without prior notice or a warrant is an inspection conducted pursuant to the provisions of subsection (a). Even the types of inspections having more specific authority, *e.g.,* sections 103(g)(1) and (i), are conducted without warrants and notice and are thus conducted pursuant to the provisions of subsection (a).

sions of the Occupational Safety and Health Act.[9]

For these reasons, we conclude that the spot inspection conducted in this case was conducted "pursuant to the provisions of subsection (a)," at least for purposes of participation rights.[10] If the right to walkaround pay has the same scope as the right to accompany the inspector, then we must affirm the Commission's decision. We turn next to the question whether those two rights are identical in scope.

## B. The Remarks of Representative Perkins.

The heart of petitioner's case is that walkaround pay limits are narrower than the right to accompany the federal inspector. Petitioner agrees that the right to accompany the inspector extends to any inspection under the Act, but it argues that walkaround pay rights apply only to the regular inspections specifically mandated by section 103(a). Petitioner thus seeks to bifurcate the participation rights and the walkaround pay rights granted by section 103(f).

The support for petitioner's position is the only explicit reference in the legislative history to the specific issue now before the court. That reference came in the remarks of Representative Carl Perkins in his report to the House of Representatives on the actions of the conference committee in resolving the differences between the House and Senate bills. Representative Perkins was the chairman of the House Committee on Education and Labor, the lead House sponsor of the Act and the chief House conferee in the conference committee.

In his report on the work of the conference committee, Representative Perkins made the following statements:

> Mr. Speaker, before concluding my remarks I would like to address one aspect of the conference report that seems to be somewhat ambiguous.
>
> * · * * * * *
>
> Section 103(f) provides that a miners' representative authorized by the operator's miners shall be given an opportunity to accompany the inspector during the physical inspection and pre- and post-inspection conferences pursuant to the provisions of subsection (a). Since the conference report reference is limited to the inspections conducted pursuant to section 103(a), and not to those pursuant to section 103(g)(1) or 103(i), the intention of the conference committee is to assure that a representative of the miners shall be entitled to accompany the Federal inspector, including pre- and post-conferences, at no loss of pay *only during the four regular inspections of each underground mine and two regular inspections of each surface mine in its entirety*, including pre- and post-inspection conferences.
>
> * * * * * *
>
> Since the conference report does not refer to any inspection, as did section 103(h) of the 1969 act, but, rather to an inspection of any mine pursuant to subsection (a), it is the intent of the commit-

---

**9.** *See* 29 U.S.C. § 657(e) (1982); 123 Cong.Rec. 19927 (1977) (remarks of Sen. Javits), *reprinted in* Legislative History at 910. At oral argument, counsel for petitioner pointed out that S. 717, the version passed in the Senate, originally described the participation right with the phrase: "during the physical inspection of any mine *under* subsection (a)." S. 717, 95th Cong., 1st Sess. § 104(e), *reprinted in* Legislative History at 1115 (emphasis supplied). The conference committee amended the phrase to read: "during the physical inspection of any coal or other mine *made pursuant to the provisions of* subsection (a)." 30 U.S.C. § 813(f) (emphasis supplied). We are unable to attribute any significance to this minor change of wording. The words have essentially identical meanings, and the conference committee report did not bother to mention the change. The revision appears to have merely brought the phrase in question into line with the OSH Act provisions which were the drafters' model for what became section 103(f).

**10.** The right to accompany an inspector does not necessarily apply each time a federal inspector enters mine property for any purpose; rather, the language of subsection (f) limits the right to physical inspections of mines and to inspection conferences. *See* 43 Fed.Reg. 17547–48 (1977).

tee to require an opportunity to accompany the inspector at no loss of pay *only for the regular inspections mandated by subsection (a), and not for the additional inspections otherwise required or permitted by the act.* Beyond these requirements regarding no loss of pay, *a representative authorized by the miners shall be entitled to accompany inspectors during any other inspection exclusive of the responsibility for payment by the operator.*

123 Cong.Rec. 35410 (1977), *reprinted in* Legislative History at 1356–58 (emphasis supplied).

These remarks by Representative Perkins are not at all ambiguous. They squarely support petitioner's contention that Congress intended to permit miner participation in all mine inspections but to restrict walkaround pay rights to only the regular inspections required by subsection (a). If Representative Perkins reflected the intentions of Congress regarding the scope of walkaround pay rights, then we should disagree with the District of Columbia Circuit and should reverse the Commission's decision.

As we read section 103(f), the language of the statute appears quite clearly to extend walkaround pay rights whenever the participation rights apply. Participation rights apply to all inspections made "pursuant to the provisions of subsection (a)," and walkaround pay rights apply to the miner representative's "participation in the inspection made under this subsection." Despite the arguable ambiguity in the scope of participation rights, discussed above, the language of the statute gives the two rights identical scope.

■ However, we decline to take refuge in the "plain meaning" rule and ignore the legislative history. The Act was a complex piece of legislation, involving a perhaps fragile balance among the competing interests of miners and mine owners. And in view of the substantial disagreements over the meaning of the statute's walkaround pay provisions,[11] we shall not close our eyes to the relevant legislative history. As Justice Frankfurter once wrote, the courts' "task is to construe not English but congressional English." *Commissioner v. Acker*, 361 U.S. 87, 95, 80 S.Ct. 144, 149, 4 L.Ed.2d 127 (1959) (Frankfurter, J., dissenting). Nevertheless, the plainer the statutory language, the more explicit, convincing and reliable the contrary legislative history must be to persuade a court to follow the indications in the legislative history. *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir.), *cert. denied*, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). *See Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976).

The central problem in the case before us is to determine the appropriate weight that we should give Representative Perkins' statement in interpreting the language of the statute. In so doing we must exercise caution. On one hand, we should not disregard the clearly expressed intent of Congress, particularly if the Congress specifically considered the issue now before us. At the same time, we must bear in mind that the language of the statute is the most reliable indicator of congressional intent. It is that language which is chosen with the most care, subjected to the greatest scruti-

---

**11.** Before the District of Columbia Circuit issued its decision in *United Mine Workers, supra,* the Commission and the Department of Labor had reached opposite conclusions regarding the scope of walkaround pay rights. In 1978 the Assistant Secretary of Labor for MSHA issued a Federal Mine Safety and Health Act Interpretive Bulletin, 43 Fed.Reg. 17548–49 (1978), finding that the Act's walkaround pay rights are not limited to the regular inspections and are as broad as the participation right. In the three decisions which the District of Columbia Circuit reversed in *United Mine Workers,* a majority of the Commission had concluded that Representative Perkins' comment were dispositive and that walkaround pay rights should apply only to regular inspections. In the present case, there is no conflict between the Secretary's and Commission's positions. We therefore need not address the nettlesome question of whose statutory interpretation should be accorded greater deference. *See United Mine Workers, supra,* 671 F.2d at 623 n. 26, 626 n. 40; *id.* at 635 (Tamm, J., dissenting).

ny and actually voted on by Congress and signed by the President. Excessive deference to the comments of one legislator, even one as deeply involved as Representative Perkins was in this legislation, may undermine the intent of Congress as expressed in the statute and might permit those who have lost in the Congress to prevail in the courts. We recognize that the "intent of Congress" may be an elusive creature, but that is what we seek to discover and apply.

Whether the statements on the floor are a reliable communication of congressional intent depends on a number of factors involving the entire context of the Act's legislative development and passage. One important factor is Representative Perkins' own extensive involvement in the development of the Act. He was a principal sponsor of the House bill. He was chairman of the committee that considered the bill. And he was the lead conferee for the House. His statement was made while giving his colleagues a report on the actions of the conference committee regarding a subject on which the prior House and Senate bills had not been consistent. (The House bill had provided only for participation rights, as did the old Coal Act. The Senate version was the one enacted as section 103(f).)

 There is considerable room for disagreement about the proper treatment of a sponsor's or conferee's interpretation of a bill. The remarks of a single legislator, even a sponsor or conferee, do not control the analysis of legislative history. *Weinberger v. Rossi,* 456 U.S. 25, 35 & n. 15, 102 S.Ct. 1510, 1517 & n. 15, 71 L.Ed.2d 715 (1982); *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); *General Electric Co. v. United States,* 610 F.2d 730, 734, 221 Ct.Cl. 771 (1979). But the sponsor's or conferee's interpretation is ordinarily accorded substantial weight, at least when it is consist-

ent with the statute and the rest of the legislative history. *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564 & n. 17, 96 S.Ct. 2295, 2304, & n. 17, 49 L.Ed.2d 49 (1976); *National Woodwork Manufacturers Association v. N.L.R.B.,* 386 U.S. 612, 639–40, 87 S.Ct. 1250, 1265–1266, 18 L.Ed.2d 357 (1967); *In re Grand Jury Investigation of Cuisinarts, Inc.,* 665 F.2d 24, 34 (2d Cir.1981), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *Symons v. Chrysler Corp. Loan Guarantee Board,* 670 F.2d 238, 242–43 (D.C.Cir.1981); *State of Kansas ex rel. Stephan v. Adams,* 608 F.2d 861, 865–66 (10th Cir.1979), *cert. denied,* 445 U.S. 963, 100 S.Ct. 1651, 64 L.Ed.2d 238 (1980). We decline to formulate a rule for the level of deference to which Representative Perkins' remarks are entitled. It is clear that his remarks may not be dismissed lightly as either off-the-cuff remarks by a legislator with only passing acquaintance with the bill or as last-ditch efforts by a disgruntled opponent to undermine the majority's intentions. At the same time, however, we must consider other factors affecting the authority of the statement. Not everything a sponsor or conferee says has the force of law.[12]

Representative Perkins' comments are the only mention in the legislative history of the specific issue before us. However, the treatment of the walkaround pay rights in the rest of the legislative history, including the silence on the precise issue before us, is also relevant here. The walkaround pay provisions of the Act originated in the Senate, as mentioned above. The House bill had followed the old Coal Act terms which provided for participation rights on any inspection, but no walkaround pay rights. The Senate committee report stressed the importance of involving miners in the inspection process in order both to improve the quality of inspections and to enhance miners' safety and health awareness. S.Rep. No. 181, 95th Cong., 1st Sess.

---

**12.** *See generally* 2A *Sutherland on Statutory Construction* §§ 48.14, 48.15 at 220–22 (4th ed. 1973); Cox, *Judge Learned Hand and the Interpretation of Statutes,* 60 Harv.L.Rev. 370 (1947); R. Dickerson, *The Interpretation and Application of Statutes* 138–64 (1975); Wasby, *Legislative Materials as an Aid to Statutory Interpretation: A Caveat,* 12 J.Pub.L. 262 (1963).

28–29 (1977), *reprinted in* Legislative History at 616–17. The committee said the bill provided for walkaround pay to encourage miner participation. "To provide for other than full compensation would be inconsistent with the purpose of the Act and would unfairly penalize the miner for assisting the inspector in performing his duties." *Id.* In floor debate on a proposed amendment to delete the walkaround pay provisions, Senator Javits, who sponsored the Senate bill, argued that walkaround pay rights were necessary to provide for the desired degree of miner involvement. 123 Cong.Rec. 20019–20 (1977), *reprinted in* Legislative History at 1054–55. Neither the Senate Report nor the Senate floor debates identify any ambiguity in the relationship between walkaround pay rights and participation rights, nor do they·mention any possible bifurcation of the two rights.

Also relevant is the published conference report's treatment of the walkaround pay provision. The conference report described several differences between the House and Senate bills regarding miner participation in inspections. In every respect, the Senate version provided for more extensive participation rights than did the House version. The conference report merely said: "The conference substitute conforms to the Senate bill." S.Conf.Rep. No. 461, 95th Cong., 1st Sess. 45 (1977), *reprinted in* Legislative History at 1323. The report mentions no compromises or ambiguities with respect to these provisions.

In addition, Representative Perkins made his remarks after the Senate had already given the bill final consideration and had passed it. The District of Columbia Circuit said that the Senate therefore "had little or no realistic opportunity to voice its concurrence with or opposition to the gist of his remarks." 671 F.2d at 622. The statement might thus be given much less weight as a statement reflecting at most only the House's intentions and not the Senate's. *See id. See also National Association of Greeting Card Publishers v. United States Postal Service,* 462 U.S. 810, ── & n. 28, 103 S.Ct. 2717, 2731 & n. 28, 77 L.Ed.2d 195 (1983) (statement of House conferees conflicted with statute and became available only after Senate had completed consideration of bill).

On the basis of all of these facts, it is possible to spin out several scenarios for congressional treatment of this walkaround pay issue. For example, it is conceivable that Representative Perkins accurately stated the intentions of Congress and that subsection (f) was only poorly worded to accomplish the desired ends. Perhaps in conference, in working out a House-Senate compromise on participation and walkaround pay, the conferees agreed to a walkaround pay provisions less broad than the participation right. Or perhaps the opponents of the walkaround pay provisions sought such a compromise in conference, were defeated in their efforts to include their version in either the bill or the conference report, and had to settle for an oral statement by the lead House conferee. Or perhaps the conferees agreed to disagree and to refrain from making any statements in the conference report. We have no doubt that other observers of the legislative process could conceive of other scenarios to explain the legislative history on the issue.

We cannot base our decision, of course, on such sheer conjecture about the ebb and flow of the legislative and lobbying process. As Justice Holmes once wrote, "It is a delicate business to base speculations about the purposes or construction of a statute upon the vicissitudes of its passage." *Pine Hill Coal Co. v. United States,* 259 U.S. 191, 196, 42 S.Ct. 482, 483, 66 L.Ed. 894 (1922).

■ Despite Representative Perkins' substantial role in the development of the Act, we are convinced that his remarks should not be given decisive weight. As we said above, the plainer the language of the statute, the clearer and more reliable must be the contrary indications in the legislative history to override the apparent meaning of the statutory language. *United States v. United States Steel Corp., supra,* 482 F.2d at 444. As we have ex-

598

plained, the language of section 103(f) plainly links the scope of walkaround pay rights to that of the participation rights. Participation rights apply to all inspections made "pursuant to the provisions of subsection (a)," and walkaround pay rights apply to the miner representative's "participation in the inspection made under this subsection." On the face of the statute, then, the two rights have identical scope, and we fail to see any ambiguity in the language.

■ If petitioner's position were clearly supported by the conference committee report, we might, even in the face of the statutory language, be able to reach the contrary result. Such reports are, apart from the language of the statute itself, generally the most reliable indicators of congressional intent. *See National Association of Greeting Card Publishers v. United States Postal Service, supra,* 462 U.S. at —— & n. 28, 103 S.Ct. at 2731–32 & n. 28. However, it is significant that the conference report does not even mention the purported ambiguity, let alone support the petitioner's reading. Surely if the conferees had actually agreed to the compromise petitioner hypothesizes, we think it more likely than not that there would have been language in either the statute or the conference report to support the bifurcation of participation and walkaround pay rights. Further, nothing in the floor debates suggests that any other members of Congress perceived this "ambiguity" in the bill or conference report.

To give decisive weight to Representative Perkins' remarks—in the absence of textual support or additional indications in the legislative history—would be to run too great a risk of permitting one member to override the intent of Congress as expressed in the language of the statute. We recognize that legislative history is everyday grist for the courts' mills of statutory construction. Nevertheless, statutory language remains the single most reliable indicator of Congressional intent. The comments of the District of Columbia Circuit are quite relevant:

'Courts in the past have been able to rely on legislative history for important

insights into congressional intent. Without implying that this is no longer the case, we note that interest groups who fail to persuade a majority of the Congress to accept particular statutory language often are able to have inserted in the legislative history of the statute statements favorable to their position, in the hope that they can persuade a court to construe the statutory language in light of these statements. This development underscores the importance of following unambiguous statutory language absent clear contrary evidence of legislative intent.'

*United Mine Workers, supra,* 671 F.2d at 623, *quoting National Small Shipments Traffic Conference, Inc. v. Civil Aeronautics Board,* 618 F.2d 819, 828 (D.C.Cir. 1980).

■ Without support for Representative Perkins' comments in the language of the statute or the rest of the legislative history, we cannot give his comments decisive weight. We conclude that MSHA properly cited Monterey Coal for its failure to pay the miner representative who participated in the spot inspection.

AFFIRMED.

