Antonia PARIS, et al.,
Plaintiffs, Appellees,

v.

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.,
Defendants, Appellants.

No. 87–1217.

United States Court of Appeals,
First Circuit.

Heard Sept. 11, 1987.

Decided March 23, 1988.

Reconsideration In Banc Denied
May 4, 1988.

Anthony J. Steinmeyer, Appellate Staff, Civ. Div., Dept. of Justice, with whom Marleigh D. Dover, Appellate Staff, Civil Div., Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Lincoln C. Almond, U.S. Atty., Providence, R.I., Gershon M. Ratner, Associate Gen. Counsel for Litigation, John W. Herold, Asst. Gen.

---

Counsel for Litigation, and Anthony J. Ciccone, Jr., Office of Litigation, Dept. of Housing and Urban Development, Washington, D.C., were on brief, for federal defendant, appellant.

Paul D. Snyder, Boston, Mass., for appellant Corcoran Management Co., Inc.

John W. Dineen, Rhode Island Legal Services, with whom Michael V. Milito, Rhode Island Legal Services, Providence, R.I., was on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal from a preliminary injunction entered by the district court which prevents the Department of Housing and Urban Development ("HUD") and Corcoran Management Company ("Corcoran") from employing a controversial tenant selection scheme in the leasing of certain apartments at the Chad Brown public housing project in Rhode Island. This scheme, adopted by the project manager, Corcoran, and approved by HUD, seeks to provide for a broad economic mix of tenants by allowing certain higher income families to "skip" over "very low income" families that are senior to them on the waiting list. Antonia Paris and three other named plaintiffs are "very low income" families who purport to represent a class of the same.

### I.

Chad Brown is a public housing project begun in 1943. It is a part of the Providence (Rhode Island) Housing Authority's public housing system. By the late 1970s, Chad Brown had fallen into disrepair. Not only apartments but entire buildings were vacant and boarded up.

During the late 1970s or early 1980s, HUD itself assumed an active role in the management of Chad Brown, planning a multistage modernization program. In conjunction with the Providence Housing Authority, HUD hired Corcoran to take over the management of Chad Brown and to oversee its modernization.

The modernization program consisted of sequential renovations of groups of apartments. The renovation of the first 134 units was designated "Phase I." In selecting families to reside in the Phase I apartments, Corcoran adopted criteria designed to ensure that the residents—all of whom were "lower income" for purposes of eligibility for public housing—had a broad range of incomes among themselves. Families eligible for residence at Chad Brown were divided into three groups according to income, and roughly one-third of each type of apartment in Phase I was earmarked for each of the three income groups.[1]

The Phase I apartments were further subdivided into Phase I.A, I.B, and so on. Phase I.A, consisting of 42 apartments, was completed in August 1986. These apartments were rented to families who were relocated from other Chad Brown apartments. In November 1986, renovations were completed on the 32 units in Phase I.B. The majority of these units were to be rented to new tenants.

The challenged preliminary injunction pertains to the 32 Phase I.B apartments. Corcoran maintains a waiting list for each type of apartment in Chad Brown. If Corcoran had filled the Phase I.B apartments by taking families in the order in which

---

* Of the Third Circuit, sitting by designation.

1. Eligible families were divided into the following three classes: very low income, low income, and moderate income. These classifications have little relation to the statutory classification scheme discussed below; all families qualified as "lower income" under the Housing Act. The 134 apartments in Phase I were assigned as follows:

| Two Bedrooms (56) | Three Bedrooms (73) | Four Bedrooms (5) |
|---|---|---|
| Very Low – 22 | Very Low – 24 | Very Low – 1 |
| Low – 23 | Low – 26 | Low – 2 |
| Moderate – 11 | Moderate – 23 | Moderate – 2 |

they had appeared on the waiting lists, the income-mixing goals would not have been met. Accordingly, in a September 17, 1986, letter to the tenant association's chairperson, Corcoran stated that it would ask higher income families on other Providence Housing Authority waiting lists to apply for two-bedroom apartments at Chad Brown. The result of this intended procedure was to allow higher income families to "skip over" lower income families on the Chad Brown waiting lists.

In response to Corcoran's stated "skipping" policy, the named plaintiffs brought the present action on October 6, 1986, seeking declaratory and injunctive relief against both HUD and Corcoran. Plaintiffs claimed to represent all "very low income" families on the Chad Brown waiting lists. The complaint alleges that by adopting the income-mixing scheme, HUD and Corcoran have violated the United States Housing Act of 1937 ("Housing Act"), 42 U.S.C. §§ 1437 *et seq.* (1982 & Supp. III 1985), especially 42 U.S.C. § 1437n thereof; the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* (1982); and the due process and equal protection clauses of the Constitution of the United States.

On January 14, 1987, the United States District Court for the District of Rhode Island entered a memorandum and order allowing plaintiffs' motion for a preliminary injunction. The court's ruling was based solely on the plaintiffs' Housing Act claim, and it granted class-wide relief although no class had in fact been certified. The effect of the district court's order was to enjoin preliminarily any future admissions to Chad Brown based on the income-mixing scheme.[2]

While this appeal was under consideration, one provision of the Housing Act relevant to this appeal was amended by the Housing and Community Development Act of 1987, Pub. L. No. 100–242, 101 Stat. 1815 (signed Feb. 5, 1988). Paris and HUD have submitted memoranda addressed to the effect of the new law, and we have considered these amendments in our review of the district court's decision to enjoin the Chad Brown income-mixing scheme. *See* pages 573–74, *infra.*

This case comes after this court's decision in *Martinez v. Rhode Island Housing & Mortgage Finance Corp.*, 738 F.2d 21 (1st Cir.1984). We upheld in *Martinez* a preliminary injunction enjoining an income-mixing scheme in so-called "Section 8 housing." The present case poses the question whether a like result should obtain here, in "public housing." Because of key differences—in both the applicable statutory law and in HUD's own regulations—we believe that *Martinez* is not controlling, and we vacate the district court's preliminary injunction.

## II.

The Housing Act authorizes two types of federally assisted housing: "public housing" (the kind in issue here) and "section 8 housing" (the kind in the *Martinez* case, 738 F.2d 21). Public housing was authorized by the original Housing Act of 1937. Section 8 housing was created by the Housing and Community Development Act of 1974, Pub.L. No. 93–383, § 201(a), 88 Stat. 633, 662. Section 8 housing differs from public housing in several ways. Most important, section 8 housing is owned by private parties who enter into contracts with government authorities, while public housing is owned directly by Public Housing Authorities ("PHAs"). The two types of federally assisted housing are defined at different places within the United States Code. *See* 42 U.S.C. §§ 1437a–1437e, 1437g–1437m (1982 & Supp. III 1985) (public housing); *id.* § 1437f (section 8 housing). Separate regulations have been issued by the Secretary of Housing and Urban Development, who oversees both programs. *See* 24 C.F.R. §§ 912–999 (1987) (public housing); *id.* §§ 811–899 (section 8 housing).

Occupancy in both types of federally assisted housing is limited to "lower income families," defined as "families whose in-

---

**2.** Upon stipulation of the parties, the district court allowed Corcoran to lease eight Phase I.B apartments to families who had been relocated from other Chad Brown apartments.

comes do not exceed 80 per centum of the median income for the area." 42 U.S.C. § 1437a(b)(2) (Supp. III 1985). The class of lower income families is divided into two subclasses; *low* income families,[3] whose incomes are from 80 percent to 50 percent of the median, and *very low* income families, whose incomes are below 50 percent of the median. *Id.*

Applying the terminology to this case, Paris claims to represent all very low income families on the Chad Brown waiting list. The district court found that the Chad Brown selection procedure, as applied, favors low income families over very low income families. Paris claims that this preference is contrary to law.

### III.

In *Martinez*, 738 F.2d 21, we upheld a preliminary injunction striking down a housing corporation's rule that no more than 35 percent of its section 8 assisted housing units could be rented to *very* low income families, leaving the rest for low income tenants. Central to our reasoning in *Martinez* was Congress's recent adoption of the Omnibus Budget Reconciliation Act of 1981 ("OBRA"),[4] containing a provision, codified at 42 U.S.C. § 1437n (1982 & Supp. III. 1985), that for the first time reserved the lion's share of both public housing and section 8 housing, on a national basis, for very low (as opposed to low) income families. Clause (a) of section 1437n provides that "[n]ot more than 25 per centum[5] of the dwelling units which were available for occupancy under [public housing and section 8] before October 1, 1981, and which will be leased on or after such effective date shall be available for leasing by lower income families other than very low income families." Clause (b) provides that "[n]ot more than 5 per centum of the dwelling units which become available for occupancy under [public housing and

section 8] on or after October 1, 1981, shall be available for leasing by lower income families other than very low income families."

We noted in *Martinez* that the OBRA amendments had deleted a prior provision of law, relative to section 8 but not to public housing, that required only 30 percent of assisted families to be in the very low income category at the time of the initial renting of dwelling units. 42 U.S.C. § 1437f(c)(7) (1976) (repealed). We also noted, as further signifying a change in congressional policy, that the conference report issued in 1981 at the time of OBRA's adoption had stated as follows:

> The conferees are also concerned that in carrying out the policy of creating a mix of families having a broad range of lower incomes in assisted housing that families whose incomes are between 50 and 80 percent of median not be given a priority for occupancy by virtue of their income.

738 F.2d at 25 n. 4 (citing H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 695, *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 1010, 1054).

In *Martinez* we balanced the above factors against any remaining indices that the law still allowed preferences for higher income tenants. One indication that the challenged scheme might still be proper was language in the purposes clause of section 8 that one of the purposes of the program is to promote "economically mixed housing." 42 U.S.C. § 1437f(a). *Martinez*, 738 F.2d at 25. But we determined that this by itself did not go so far as to allow the challenged preference for higher income tenants given the OBRA amendments and history. *Id.*

Significantly, we refused to consider in *Martinez*—because it was specifically made inapplicable to section 8 housing—the income-mixing provision of section 1437d (42 U.S.C. § 1437d(c)(4)(A) (Supp. III

---

**3.** This term is used here for convenience. The statute labels these families "lower income families other than very low-income families." *See, e.g.,* 42 U.S.C. § 1437n.

**4.** Pub.L. No. 97–35, §§ 321–329I, 95 Stat. 357, 398–412 (1981).

**5.** When enacted in 1981, the percentage was 10 percent. This was changed by Congress to 25 percent in 1983.

(1985)). This statute, which we discuss below as being critical to the outcome of the present appeal, empowers the Secretary of HUD to prescribe public housing tenant selection criteria ensuring that a project includes families with broad income ranges.

We concluded in *Martinez* that, on balance, OBRA and its legislative history indicated congressional abandonment of section 8 preferences for higher income families. For this reason, the lower court had not abused its discretion in issuing a preliminary injunction. However, we noted our uneasiness over the fact that HUD still had on its books certain income-mixing regulations pertaining to section 8 housing carried over from the pre-OBRA period. These were technically still in force but, since HUD was in the process of developing new regulations to implement the 1981 amendments, the situation was unclear. We ended the *Martinez* opinion expressing our concern that HUD, the agency with expertise in the administration of section 8, was not a party; its views, we opined, seemed "essential." *Id.* at 26. Accordingly, while in light of OBRA we could not say that the district court had abused its discretion in granting a preliminary injunction "for the present," we directed the district court to seek HUD's views and authorized it, in light of these, to modify or revoke the injunction as seemed appropriate. *Id.*[6]

### IV.

We have summarized our *Martinez* opinion in detail because of its impact on the district court's opinion before us. We now proceed to outline the reasoning in the latter.

The court below began by noting that section 1437n(a), added by OBRA, reserves 75 percent of units for very low income families in pre–1981 housing and that section 1437n(b) reserves 95 percent of units

for such families in post–1981 housing. The district court concluded, citing to *Martinez*, that although the income-mixing provisions of the Housing Act were yet to be repealed, "the congressional preference for lower income [*i.e.*, very low income] families in the OBRA and HURRA amendments is clear." The court went on to say,

> The Defendants cannot rely on the economic mix scheme of § 1437d(c)(4)(A)[7] which is at odds with current amendments.

The district court saw no reason why the legislative history of the OBRA amendment and the reasoning of the *Martinez* decision should apply to only one type of housing, section 8, and not to public housing also.

The district court rejected the argument that since the 75 percent nationwide requirement of very low income tenants in pre-October 1981 projects had already been exceeded, there was no restriction applicable to Chad Brown under section 1437n(a). The court stated that the 75 percent goal was not just a national goal but had to be met on a project-by-project basis.

The district court further stated that the units in question were likely not pre–1981 housing (to which only a 75 percent very low income occupancy goal applied) but might well be post–1981 housing (to which a 95 percent very low income standard applied). While the units were originally built in 1943 and 1952, only 105 of 350 had been modernized and were capable of occupancy by October 1, 1981, the cut-off date.

The district court concluded that,

> A preference for implementing an economic mix scheme is in direct conflict with the legislative intent of the OBRA amendment, § 1437n.

---

**6.** We understand that because the *Martinez* litigation was settled soon after, the directed dialogue with HUD never occurred. However, the regulations subsequently adopted by HUD no longer authorize preferences for higher income groups in section 8 housing. *See* 49 Fed.Reg. 19,926, 19947 (May 10, 1984) (final rule); 47 Fed.Reg. 57,954, 57,960, 57,969 (Dec. 29, 1982) (proposed rule) The *Martinez* result is accord-

ingly consonant with HUD's current position. As discussed below, however, HUD has taken a different view regarding public housing.

**7.** To reiterate, section 1437d(c)(4)(A) authorizes the Secretary to prescribe income-mixing procedures for public housing. *Infra* at 566.

## V.

In deciding whether the district court correctly issued a preliminary injunction, we shall focus on whether Paris "exhibited a likelihood of success on the merits." *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). This, of course, is but one of several relevant factors, but since it is dispositive here, we need not consider the others.

■ We are unable to see this case as a mere replay of *Martinez*. Unlike the income-mixing scheme there, the present one is authorized by current, post-OBRA, HUD regulations—regulations adopted pursuant to a very specific congressional grant of authority to the Secretary of HUD to regulate tenant selection and income-mixing criteria in public housing. 42 U.S.C. § 1437d(c)(4)(A). No such specific grant of authority existed relative to the section 8 statute considered in *Martinez*, nor were there, at the time, any up-to-date HUD regulations authorizing what was done. There were, to be sure, some relevant pre-OBRA regulations promulgated under a very general grant, but we doubted that these deserved great weight given the vast changes wrought by OBRA in respect to enlarged quotas for very low income tenants and OBRA's legislative history. As explained in *Martinez*, moreover, we lacked at that time not only any post-OBRA HUD regulations but even the views of HUD, the agency charged with administration of the statute. Here we have both.

### A. HUD'S REGULATORY AUTHORITY

The most critical relevant difference between the section 8 statute considered in *Martinez* and the present one governing public housing is the income mixing provision in section 6(c)(4)(A) of the Housing Act, 42 U.S.C. § 1437d(c)(4)(A). Adopted in 1974, this provision was made specifically inapplicable to section 8. 42 U.S.C.

§ 1437f(h) (1982); *see Martinez*, 738 F.2d at 25. It is fully applicable, however, to public housing and has survived the 1981 OBRA amendments. It provides that every annual contributions grant to public housing agencies shall provide that,

(4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to—

(A) except for projects or portions of projects specifically designated for elderly families with respect to which the Secretary has determined that application of this clause would result in excessive delays in meeting the housing needs of such families, *the establishment of tenant selection criteria* which gives [sic] preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance under this chapter or are paying more than 50 per centum of family income for rent [8] and which is *designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes* and will avoid concentrations of low-income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available....

Housing Act § 6(c)(4), 42 U.S.C. § 1437d(c)(4) (Supp. III 1985) (emphasis added.)

The current HUD regulations issued pursuant to this statute and pertinent to income mixing in public housing are codified at 24 C.F.R. § 960.204–.205 (1987). Section 960.204 sets forth the general policies which PHAs should follow in the adoption of admission criteria for public housing projects.

---

8. Paris does not claim that the purported class is comprised of these three types of families to

which the statute gives a preference.

Such policies and procedures shall be designed to: ... (3) subject to the requirements and limitations of Part 913 [9] of this chapter, attain, within a reasonable period of time, a tenant body in each project composed of families with a broad range of incomes and rent-paying ability that is generally representative of the range of incomes of lower income families in the PHA's area of operation, as defined in state law.

*Id.* § 960.204(b). Section 960.205 contains the more specific "Standards for PHA tenant selection criteria."

Subject to the requirements and limitations of Part 913 of this chapter, the criteria to be established [by the public housing authority (PHA)] shall be reasonably related to achieving the basic objective of attaining, within a reasonable period of time, a tenant body in each project composed of families with a broad range of income, generally representative of the range of income, and rent paying ability of lower income families in the PHAs area of operation, as defined in state law. To accomplish the objective PHAs shall:

·      ·      ·      ·      ·

(8) Utilizing the above information, develop criteria, *by preference or otherwise,* which will be reasonably calculated to attain the basic objective. The criteria developed shall be sufficiently flexible to assure administrative feasibility. A dwelling unit should not be allowed to remain vacant for the purpose of awaiting application by a family falling within the appropriate range.

*Id.* § 960.205(c) (emphasis added). The regulations say that the income-mixing criteria may be implemented "by preference or otherwise." The Chad Brown scheme can be described as a limited preference for low income families over very low income families designed to achieve a tenant body with a broad income range. Thus, as HUD itself believes, the Chad Brown scheme falls squarely within this regulation.

It is important to observe that the HUD regulations here are of the kind which carry the force of law and to which courts must ordinarily defer. That is so because Congress delegated to the Secretary express authority to set "procedures and requirements" establishing "tenant selection criteria ... designed to assure that ... the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families...." 42 U.S.C. § 1437d(c)(4)(A). Where Congress expressly delegates to the Secretary the power to prescribe standards,

Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner.

*Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). *Accord Schweiker v. Gray Panthers,* 453 U.S. 34, 43–44, 101 S.Ct. 2633, 2639–40, 69 L.Ed.2d 460 (1981). *Compare Rowan Companies v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2293, 68 L.Ed.2d 814 (1981). *See also Mayburg v. Secretary of Health & Human Services,* 740 F.2d 100, 106 (1st Cir.1984) (Breyer, J.) ("If Congress *expressly* delegates a law-declaring function to the agency, of course, courts must respect that delegation.").

Only if the Secretary's regulations exceed the statutory grant or are arbitrary, capricious or an abuse of discretion, may they be set aside. *Batterton v. Francis,* 432 U.S. at 426, 97 S.Ct. at 2406; *Schweiker v. Gray Panthers,* 453 U.S. at 44, 101 S.Ct. at 2640. We see no such problems here.

### B. THE OBRA AMENDMENTS ARE CONSISTENT WITH SECTION 1437d(c)(4)(A).

The OBRA amendments did not expressly amend or revoke 42 U.S.C.

---

**9.** In Part 913 HUD has codified the regulations which implement the section 1437n limits on low income family occupancy in public housing.

§ 1437d(c)(4)(A), leaving it in effect to this day. While, as discussed in *Martinez*, the increased quotas for very low income tenants set out in section 1437n constrain the amount of income mixing that can be done, section 1437d(c)(4)(A) is not rendered inoperable. The district court took a contrary view, primarily because it believed that the limitations in section 1437n were required to be applied on a project-by-project basis. However, both the statutory language and the legislative history indicate that the quotas express nationwide limits only.

> The Conferees, by establishing national percentage limitations, do not intend that each lower income housing project or each individual program be limited to the specific percentage. The HUD Secretary has the discretion to set differing percentages for separate programs (such as public housing, section 8 new-family, section 8 new-elderly, or section 8 existing), which, when aggregated, will comply with the overall national limitation.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 689, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1010, 1048.[10]

HUD, when first imposing implementing regulations, said,

> For projects that were initially available for occupancy before October 1, 1981, this rule imposes no project-by-project restriction because the Department believes the statutory limit ... can be met without the imposition of these restrictions.

49 Fed.Reg. 21,476, 21,481 (May 21, 1984). The current regulations under section 1437d(c)(4)(A) are expressly made "subject to the [nationwide] requirements and limitations of Part 913" (codifying section 1437n limitations). 24 C.F.R. § 960.204–.205 (1987). HUD insists that the present Chad Brown income-mixing scheme is fully compatible with section 1437n(a) limitations construed on a nationwide basis, and we find nothing in the record to contradict this.[11] Nor can we say that it is irrational to apply a provision of this type to some but not all projects (if such is the case). Chad Brown's past failure might, for example, justify the conclusion that income mixing would be a beneficial stabilizing influence on the project. Whatever the reasons, there is nothing to indicate the challenged provision conflicts in this particular instance with section 1437n.

The Supreme Court has said,

> In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.

*Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). *See St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 778, 101 S.Ct. 2142, 2146, 68 L.Ed.2d 612 (1981). Here there is no such irreconcilable conflict between section 1437d(c)(4)(A) and the subsequently enacted section 1437n as

---

**10.** In *Gholston v. Housing Authority*, 818 F.2d 776 (1987), a panel of the Eleventh Circuit recently stated that every PHA must comply with the limits in section 1437n. *Id.* at 779. We find this assertion unpersuasive for the following reasons: (1) the court's interpretation of section 1437n was adopted without discussion, and was apparently not contested by the parties; (2) HUD did not participate in *Gholston*, and thus the court did not have the benefit of HUD's interpretation of the statute; and (3) the *Gholston* court makes no reference to the above-quoted explanation in the Conference Report.

**11.** The district court suggested that at least some of the apartments in question, although originally constructed well before 1981, are not pre-October 1, 1981, housing but should be viewed as "dwelling units which become available for occupancy" *after* that date since they were not renovated until then. If so, the nationwide quota for higher income tenants would drop from 25 percent to 5 percent. 42 U.S.C. § 1437n(b). HUD responds by relying upon its own regulations which, it says, both demonstrate to the contrary and deserve deference. 24 C.F.R. §§ 913.104(b); 913.105. We do not reach this issue since no specific evidence has been called to our attention demonstrating that the scheme in question would violate either aspect of the statute as construed on a national basis. *See also* Housing and Community Development Act of 1987, § 103(a) (to be codified at 42 U.S.C. § 1437n(c)) (instructing the Secretary that the section 1437n(b) limits apply on an aggregate basis).

would lead us to infer a repeal of the former by implication.[12]

## C. THE CONFERENCE REPORT DISAPPROVING INCOME PREFERENCE CANNOT OVERRIDE THE STATUTE.

There remains, however, a troubling question as to whether language in the conference report issued in 1981, when the OBRA amendments including section 1437n were adopted, should be considered as an "affirmative showing of an intention [by Congress] to repeal" the income mixing provision in section 1437d(c)(4)(A). *Mancari*, 417 U.S. at 550, 94 S.Ct. at 2482. The conference report, as we have previously noted, includes the following statement:

The conferees are also concerned that in carrying out the policy of creating a mix of families having a broad range of lower incomes in assisted housing that families whose incomes are between 50 and 80 percent of median not be given a priority for occupancy by virtue of their income.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. at 695, 1981 U.S.Code Cong. & Admin.News 1054. Although what it means to "give a priority" is somewhat ambiguous, we assume arguendo that the Chad Brown practice of sometimes skipping over very low income families on the waiting list in favor of higher income tenants falls within this language.

The conference report must, however, be viewed in its legislative context. The Senate version of OBRA had a provision which would have deleted the very provision here in issue. *See* S. 1377, 97th Cong., 1st Sess. § 322–4(c) (1981) (deleting the income-mixing provision in Housing Act § 6(c)(4)(A)). The House bill contained no such provision, and the Conference Committee declined to adopt the Senate version. Instead the quoted conference report language appeared.

At this point we come to something of a roadblock. On the face of the statute, and under the authorized regulations, the income-mixing program adopted by Corcoran is lawful. However, the conference report to the OBRA amendments expresses disapproval of the practice embodied in the program. On the one hand, "[w]hen we find the terms of the statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). A conference report, moreover, is just that—a report, not a legislative act requiring the votes of the requisite number of legislators. Still, the statement of a conference committee is not to be taken lightly. Because a conference committee acts on behalf of both houses of Congress, many courts have found its views to be a significant indicator of congressional intent. *See, e.g., Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986); *Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985); *Monterey Coal Co. v. Federal Mine Safety & Health Review Commission*, 743 F.2d 589, 598 (7th Cir.1984).

Our resolution of this dilemma is suggested by the D.C. Circuit's recent decision in *International Brotherhood of Electrical Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697 (D.C.Cir.1987).[13]

---

**12.** Paris argues that to uphold the injunction we need not find that the income-mixing provision is repealed by implication; rather we need only hold that the OBRA amendments limited the Secretary's discretion to choose the *method* by which income mixing is achieved. This is a distinction without a difference. The result of Paris's position would be a revocation of some of the authority granted to the Secretary in section 1437d(c)(4)(A). Furthermore, HUD states that because of the disproportionate number of very low income families on public housing waiting lists, skipping is required to achieve income mixing "within a reasonable period of time." 42 U.S.C. § 1437d(c)(4)(A).

**13.** HUD argues that the present case is controlled by *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979), which holds that the legislative history to an amendment may not be construed to retroactively amend existing law. *Oscar Mayer*, however, only addressed a situation where the amendments themselves were not related to the change in existing law suggested by the amendment's legislative history. *See id.* at 758 n. 5, 99 S.Ct. at 2072 n. 5. In this case, section 1437n *is* related to section 6(c)(4)(A) of the Housing Act. By imposing aggregate limits on the number of low income families in public housing, the amount of mixing between low income families

In that case, the D.C. Circuit overturned the NLRB's determination that language in certain committee reports required the NLRB to modify a statutory standard. The court explained that "[w]hile a committee report may ordinarily be used to interpret unclear language contained in a statute, a committee report cannot serve as an *independent statutory source having the force of law." Id.* at 712 (emphasis in original; footnote omitted). Judge Buckley, concurring, stated that the language in the committee reports "served a political rather than legal purpose." *Id.* at 717 (Buckley, J., concurring). Although the court was not bound by the congressional statement in the committee reports,

> [t]his does not mean that the agreement to include the report language was an empty gesture. To the contrary, there can be little doubt that the two committees expected the Board to pay attention to their directive—not because it had the force of law, but because agencies are not given to ignoring the commands of potentates who control their budgets and oversee their operations. As counsel for one agency recently acknowledged in oral argument before this court, while an instruction in an oversight committee's report did not bind the agency legally, it did so "as a practical matter." To underscore his point, he added: "[W]e are not talking law school enforcement, legal textbook arguments; we're talking political reality here."
>
> This political reality is well understood by professionals. Thus the inclusion of the admonition in the committee reports could be expected to provide the margin of assurance required to secure the support of at least some of the legislators and lobbyists who were concerned over the prospect of proliferating bargaining units.
>
> ....
>
> [This interpretation] suggests an endemic interplay, in Congress, of political and legislative considerations that makes it necessary for judges to exercise extreme caution before concluding that a statement made in floor debate, or at a hearing, or printed in a committee document may be taken as statutory gospel. Otherwise, they run the risk of reading authentic insight into remarks intended to serve quite different purposes.

*Id.* at 716–17 (citations omitted).

We find the reasoning of both the panel and concurrence in *Electrical Workers* to be persuasive in this case. To hold that the Chad Brown income-mixing program violated the Housing Act would allow the conference report to serve as an "independent statutory source having the force of law." We decline to give such weight to this language, especially when the same conference committee declined to adopt a provision which could have removed the Secretary's authority to approve the Chad Brown program. *Cf. NLRB v. Wentworth Institute,* 515 F.2d 550, 555 (1st Cir.1975) ("Moreover, a very possible, perhaps the most obvious, interpretation of the rejection of the House exclusion would be that Congress meant to include nonprofit organizations. It is, in any event, doubtful practice to exalt isolated glosses above the statutory text.").

We add that the difficulties both in *Martinez* and in this case plainly stem from an ongoing struggle in Congress as between granting priority to those families with the lowest incomes and providing for a mix of incomes. Section 1437d(c)(4)(A), reflecting a mixed-income policy, was adopted in 1974 with these words:

> Experience has demonstrated that a cross-section of occupancy is an essential ingredient in creating economically viable housing as well as a healthy social environment. It is recognized by the Committee that existing public housing in many of our largest cities has become a concentration of very poor families and often predominantly of families receiving public assistance.

and very low income families is unquestionably reduced. The question with which we are presented is whether Congress wanted to *further*

restrict income mixing between these income classes by forbidding a preference in a given project which disadvantages the poorer class.

S.Rep. No. 693, 93d Cong., 2d Sess. 40, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4273, 4311.[14]

Seven years later the legislative backers of OBRA obviously saw matters differently. But while OBRA represented a victory for those who felt that preference should go to the very poor, it was not a total victory. Those interested in placing higher income, but still poor tenants in public housing were able to fight off deletion of the portion of section 1437d(c)(4)(A) which mirrored the income-mixing policy. That provision thus still carries the force of law, as the conference report does not. Moreover, the measure adopted in 1983 increasing to 25 percent the limits on upper income occupancy in pre-October 1, 1981 housing shows that legislators who favored income mixing still had influence. This amendment appears to have been a compromise following passage by the House of Representatives of a bill which would have revoked OBRA's strict limits on low income (as opposed to very low income) occupancy. H.R. 1, 98th Cong., 1st Sess. § 212 (1983) (passed by House of Representatives, 129 Cong.Rec. H5097 (July 13, 1983)). The House bill was never enacted into law, but its passage in the House indicates considerable support for that position. The sponsors of the proposed legislation believed that the supporters of OBRA were wrong

in cutting back on the availability of public housing for moderate income families. Thus the Report of the House Committee on Banking, Finance and Urban Affairs stated,

> The families who would be displaced as a result of the reduced income eligibility criteria—principally the working poor— provide the backbone of neighborhood stabilization efforts, and help to promote the economic viability of PHAs.

H.R.Rep. No. 123, 98th Cong., 1st Sess. 31 (1983); *see generally id.* at 3.

This legislative division helps explain why the current housing law shows signs of schizophrenia on the issue before us. At the same time it reinforces our view that confusion, not greater clarity, will result if we seek the intent of Congress beyond the corners of the enacted statute. While the OBRA conference report may serve important subsidiary functions, it cannot override or modify the statute itself. Neither can it suffice to manifest Congress's affirmative intent to repeal a policy and a grant of regulatory authority set out in a statute. We accordingly hold that the district court abused its discretion when it enjoined an income-mixing scheme adopted in conformity to a HUD regulation lawfully promulgated pursuant to 42 U.S.C. § 1437d(c)(4)(A).[15]

---

**14.** Paris argues that language from this same paragraph in the 1974 Senate Report can be read to show congressional disapproval of the Chad Brown "skipping" policy. First, Paris cites a *portion* of the following sentence:

> While it is expected that public housing agencies will continue *to give particular attention and priority to very low income families,* the Committee expects that in the long run we would have more housing developments which are not occupied solely by the very poor, but by a cross section of lower income households, representing a variety of household types.

S.Rep. No. 693, 93d Cong., 2d Sess. at 40, 1974 U.S.Code Cong. & Admin.News 4311, (portion quoted by Paris emphasized). In the context of the discussion, we do not find that this language shows a strong disapproval for the Chad Brown income-mixing scheme. Second, Paris quotes the following language: "However, the Committee does not approve the imposition of occupancy requirements which have the effect of denying admission to any family on the basis that its income is too low." *Id.* This statement does

not mention "skipping"; it refers to admission criteria which act as an absolute bar to certain classes of families. HUD has, in fact, forbidden admission policies or procedures which "automatically deny admission to a particular group or category of otherwise eligible applicants." 24 C.F.R. § 960.204(c)(1) (1987). *See also Gholston v. Housing Authority,* 818 F.2d 776, 781–83 (11th Cir.1987). Furthermore, to the extent (if any) these statements show some congressional disapproval of a skipping policy, they do not outweigh Congress's explicit grant of authority in section 1437d(c)(4)(A).

**15.** In an amended complaint, Paris claims that this revision of the public housing regulations violates the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* and that HUD should be bound to follow the rule promulgated in the May 1984 final regulations. The complaint was amended after the district court held a hearing on the preliminary injunction, and the district court did not mention this new ground in its memorandum and order granting the injunction. Therefore, we do not address this issue

## D. PLAINTIFFS' FURTHER ARGUMENTS

There are a few remaining issues to be addressed. Paris claims that even before the OBRA amendments Congress disapproved of preferential skipping for low income families. Paris lacks support for this contention—appellee cites to no provision in the pre-OBRA Housing Act which prevents the Secretary from implementing an income-mixing policy through a "skipping" procedure. Instead, Paris advances weak arguments based on case law and legislative history. Appellee cites three cases,[16] but all of these concern the Housing Act as

and specifically leave open the question of the lawfulness of the HUD regulations in this regard.

**16.** *Fletcher v. Housing Authority,* 491 F.2d 793 (6th Cir.), *vacated and remanded,* 419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974); *Crawford v. Metropolitan Development & Housing Agency,* 415 F.Supp. 41 (M.D.Tenn.1976); *Colon v. Tompkins Square Neighbors, Inc.,* 294 F.Supp. 134 (S.D.N.Y.1968).

**17.** In *Fletcher v. Housing Authority* ("*Fletcher I*"), 491 F.2d 793 (6th Cir.1974), the court held that an income-mixing scheme violated the Housing Act. The court explained that "HUD will have to win Congressional approval before it may again try to implement such a preference for more affluent applicants." *Id.* at 807. *Fletcher I* was vacated and remanded for reconsideration in light of the Housing and Community Development Act of 1974, Pub.L. No. 93–383, § 201, 88 Stat. 633, 653, which first enacted the income-mixing provision in section 6(c)(4)(A) of the Housing Act. *See* 419 U.S. at 812, 95 S.Ct. at 27. On remand, two members of the panel decided that the 1974 amendments did not have retroactive effect, and reinstated the judgment in *Fletcher I. Fletcher II,* 525 F.2d at 535. In dissent, Judge Edwards did examine the new law, and found that the 1974 amendments were "designed explicitly to command the tenant selection criteria" at issue in the case. *Fletcher II,* 525 F.2d at 538.

**18.** One of these statements serves as the basis for our dissenting colleague's contention that the injunction should be upheld. With all respect, we find his contention far-fetched. In our view, skipping was fairly clearly allowed under Housing Act § 6(c)(4)(A). *See* note 14, *supra.* Subsequent amendments to Housing Act § 6(c)(4)(A) indicate that skipping is allowed under that provision as originally enacted, or at least that Congress has acquiesced to HUD's interpretation. (HUD has always believed that

it existed prior to 1974—*before* Congress had enacted the income-mixing provision. In fact, the one federal judge who has addressed the issue of income mixing under the post–1974 Housing Act stated that a program similar to the Chad Brown program was allowed under the Act. *See Fletcher v. Housing Authority ("Fletcher II"),* 525 F.2d 532, 535 (6th Cir.1975) (Edwards, J., dissenting).[17] Paris also looks to two phrases in the legislative history of the income-mixing provision in section 6(c)(4)(A). As discussed in footnote 14 above, we do not find that these statements express disapproval of income-mixing schemes which employ "skipping." [18]

skipping was lawful under Housing Act § 6(c)(4)(A) as passed in 1974. *See* 40 Fed.Reg. 33,445, 33,447 (Aug. 8, 1975) (first promulgating 24 C.F.R. § 860.205(c)(8), which allows income mixing to be attained "by preference or otherwise"). Although, as the dissent points out, HUD at one point seemed to believe that OBRA revoked that authority, the effect of OBRA is a different question, fully addressed in the body of the opinion.) On *three* different occasions, Congress has amended Housing Act § 6(c)(4)(A) to excuse certain classes of families from the burden imposed by income-mixing procedures. *See* Housing and Community Development Amendments of 1979, § 206, Pub.L. No. 96–153, 93 Stat. 1101, 1108 (families which occupy substandard housing or are involuntarily displaced); Housing and Community Development Act of 1980, § 201(e), Pub.L. No. 96–399, 94 Stat. 1614, 1625 (elderly families who are applying to projects or portions of projects set aside for the elderly); Supplemental Appropriations Act, 1984, § 203(a), Pub.L. No. 98–181, 97 Stat. 1153, 1178 (1983) (families paying more than 50 percent of family income for rent). The 1980 amendment explicitly adverts to the fact that income mixing may result in delayed admission. *See* 42 U.S.C. § 1437d(c)(4)(A) (relieving elderly families from the effects of income mixing if the "Secretary has determined that application of this clause would result in excessive delays"). If, as the dissent believes, Congress disagreed *with the Secretary's interpretation* that skipping was a lawful method to achieve income mixing, in enacting any one of these laws (as well as OBRA) Congress could have simply refuted the Secretary's interpretation. Instead, Congress has chosen to relieve only certain very low income families from the burden on income mixing.

Furthermore, neither the statute nor the 1974 legislative history makes any reference to skipping. In interpreting the 1974 Senate Report, the dissent assumes that in the context of a paragraph addressed to income mixing, "denying admission" must mean "skipping." We did

Paris also argues that we should disallow a preference for low income families so as "to avoid a collision" with the Fair Housing Act, 42 U.S.C. § 3608(e)(5) (1982). *See generally NAACP v. Secretary of Housing & Urban Development*, 817 F.2d 149, 154–57 (1st Cir.1987) (rejecting HUD's limited interpretation of its duty to further the policies of the Fair Housing Act). However, Paris has not pointed to anything in the current record which presents such a conflict. The injunction cannot be upheld on the basis of a conflict which, at this stage of the proceeding, is entirely hypothetical.

■ Finally, Paris cites statements in the legislative history of the Housing and Community Development Act of 1987, Pub. L. No. 100–242, 101 Stat. 1815 (1988), which express strong disapproval of skipping.[19] Our reasoning that the legislative history of the OBRA amendments cannot amend Housing Act § 6(c)(4)(A), 42 U.S.C. § 1437d(c)(4)(A), applies with even greater force to this legislative history. Unlike the OBRA amendments, the Housing and Community Development Act of 1987 in no way reduced the level of income mixing in public housing. In fact, the one amendment relevant to this appeal *increases* the amount of income mixing in public housing. In implementing the five percent limit on low income family occupancy in post–1981

housing, *see* 42 U.S.C. § 1437n(b), HUD had promulgated very restrictive regulations on the admission of low income families. *See* 24 C.F.R. §§ 813.105; 913.105 (1987). The new amendments are apparently aimed at ensuring that low income families remain in post–1981 federally assisted housing.

> In developing admission procedures implementing subsection (b) [of 42 U.S.C. § 1437n], the Secretary may not totally prohibit admission of lower income families other than very low income families, and shall establish, as appropriate, differing percentage limitations on admission of lower income families in separate assisted housing programs that, when aggregated, will achieve the overall percentage limitation in subsection (b).

Housing and Community Development Act of 1987, § 103(a) (to be codified at 42 U.S.C. § 1437n(c)). In addition, the new law provides exceptions to the strict percentage limits of section 1437n(b) for certain section 8 housing and for Indian public housing agencies. *Id.* § 103(b) (to be codified at 42 U.S.C. § 1437n(d)). These new provisions cannot be construed to *reduce* the Secretary's authority to implement income-mixing procedures. Thus the language in the committee reports expressing disapproval of HUD's current income-mixing policy is only relevant insofar as it sheds light on

not reach that conclusion on our first reading (nor did Paris so argue in his brief), and the dissent's argument does not convince us. We see no reason why "denying admission" must mean "skipping." We also decline to follow the dissent's tortuous path in interpreting the phrase *"effect of* denying admission"; legislative history simply does not bear such close reading. Finally, even if the statement supports an arguable interpretation that Housing Act § 6(c)(4)(A) prohibited skipping, the interpretation is by no means clear, and the dissent admits as much. It is therefore improper for a reviewing court to set aside legislative regulations "simply because it would have interpreted the statute in a different manner." *Batterton*, 432 U.S. at 425, 97 S.Ct. at 2405.

In sum, we believe that skipping was rather clearly lawful under Housing Act § 6(c)(4)(A) as originally enacted.

19. S.Rep. No. 21, 100th Cong., 1st Sess. 16 (1987) states

> The Committee fully expects that public housing agencies and other owners will make rea-

sonable efforts to find potential tenants with very low incomes and will not by-pass prospective tenants with very low incomes in order to serve those with higher incomes if eligible households with very low incomes are awaiting admission.

H.R.Rep. No. 122, 100th Cong., 1st Sess. 12–13 (1987), 1987 U.S.Code Cong. & Admin.News 3317, 3328, 3329, states

> However, the Committee is sensitive to the plight of people who are on long waiting lists for public and other HUD-assisted housing and recognizes that it is fundamentally unfair to skip over applicants with lower incomes who have been on the waiting list for a longer period of time in order to admit higher-income families who have applied more recently. The Committee fully expects that PHAs and other landlords of any HUD-subsidized housing will not skip over families with lower incomes who are waiting to be admitted. The Committee expects that, in implementing this provision, HUD will prohibit PHAs and other landlords from engaging in such unfair practices.

the intent of the Congress which, 13 years before, originally enacted Housing Act § 6(c)(4)(A). As a general matter, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 2061, 64 L.Ed. 2d 766 (1980) (citation omitted). *See also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979). Given the series of prior congressional disputes over this very same issue, we are not persuaded that the language in the committee reports of the 100th Congress has any impact on the proper interpretation of Housing Act § 6(c)(4)(A).

Instead, Congress's latest actions with respect to income mixing merely reaffirms the lesson gleaned from the legislative history of OBRA: whether to pursue the goal of income mixing, even if this forces very low income families to remain on waiting lists, is a difficult, even agonizing question of public housing policy. Since we have found that Congress has explicitly delegated this question to HUD, we must abide by HUD's decision unless it is arbitrary, capricious, or an abuse of discretion.

## VI. CONCLUSION

In sum, we find that the Chad Brown income-mixing procedure meets the requirements of the HUD regulations considered in this opinion and that these regulations are within the authority granted to the Secretary of HUD under 42 U.S.C. § 1437d(c)(4)(A). Since in granting the injunction the district court relied on its ruling that the income-mixing procedure violated the Housing act,[20] the preliminary injunction must be vacated. While the decision to grant or deny a preliminary injunction is reversible only for an abuse of discretion, an incorrect finding of law in determining the likelihood of success on the merits is not within the district court's discretion. *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). *See also Thorn-*

*burgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986).

*The order of the district court is vacated.*

BOWNES, Circuit Judge (dissenting).

I have no quarrel in this case with the majority's rejection of much of the reasoning underlying the district court opinion. There were three principle reasons set forth by the district court in support of its conclusion that plaintiffs had a likelihood of success on the merits: first, that, under this court's decision in *Martinez v. Rhode Island Housing & Mortgage Finance Corp.*, 738 F.2d 21 (1st Cir.1984), the 1981 OBRA amendments constitute an implicit repeal of the public housing income mix provisions of section 1437d(c)(4)(A); second, that the percentage limitations imposed by section 1437n should be applied on a project-by-project rather than a nationwide basis; and, third, that Chad Brown was probably post-October 1, 1981 housing for purposes of the section 1437n limitations. I agree fully with the majority's conclusion: that *Martinez* is not controlling here because it concerns section 8 housing to which the section 1437d(c)(4)(A) income mix provisions do not apply; that section 1437n's percentage limitations apply on a nationwide basis; and that the question of whether Chad Brown is pre- or post-October 1, 1981 housing is not relevant to this appeal because there is no evidence that the policies in effect would violate the section 1437n limitations as construed on a national basis. Were these the only issues before this court, I would be compelled to concur.

But it does not follow automatically that, because the district court's reasoning was faulty in some respects, the preliminary injunction must be vacated. Other legal grounds may support the preliminary injunction, and review of the issuance of a preliminary injunction is generally limited

---

**20.** We express no opinion on the additional grounds for relief claimed in Paris's complaint and amended complaint, nor on the propriety and effect of the district court's granting of class-wide relief prior to class certification.

to an abuse of discretion standard. *University of Texas v. Camenisch*, 451 U.S. 390, 393, 101 S.Ct. 1830, 1832, 68 L.Ed.2d 175 (1981); *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). Because I believe that the legislative intent underlying the original income mix provisions, as restated in conjunction with the 1981 OBRA amendments and the 1987 Housing Act, forbids skipping over families because they are too poor, I do not think that the district court abused its discretion and that the injunction should be vacated. Accordingly, I dissent.

As noted in the majority opinion, the income-mixing provisions in dispute here are amendments to the 1937 Housing Act passed as part of the Housing and Community Development Act of 1974. The relevant section, now codified at 42 U.S.C. § 1437d(c)(4)(A), provides:

(4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to:

(A) ... the establishment of tenant selection criteria ... designed to assure that, within a reasonable time, the project will include families with a broad range of incomes and will avoid concentrations of low-income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available[.]

Although providing that tenant selection criteria should "assure" that a mix of tenant incomes is obtained, this section plainly does not articulate what particular criteria or methods of selection should be employed. Nowhere does the statute either require or condone the practice of skipping over very low income families in favor of those with higher incomes. Apparently contemplating that a variety of methods might be employed, the statute refers only to one particular method—allowing vacancies to await higher income families in order to obtain a mix—and forbids it.

Faced with statutory language which is thus ambiguous as to method, the need to review the applicable legislative history becomes apparent. The most relevant legislative history I have been able to uncover is the report prepared by the Senate Banking, Housing and Urban Affairs Committee to accompany S. 3066, a bill which eventually became the 1974 Act in lieu of a House-sponsored alternative. The pertinent section of that report, which is examined in a piecemeal fashion in the majority opinion, is set out at some length below in order to provide context for the committee's statement.

Occupancy [of public housing] would be limited to families who at time of entry are low-income families, and at least 20% of all new housing would be occupied by very low-income families. Very low income families are defined as families whose income does not exceed 50% of the median income for the area. While it is expected that public housing agencies will continue to give particular attention and priority to very low-income families, the Committee expects that in the long run we would have more housing developments which are not occupied solely by the very poor, but by a cross section of lower income households, representing a variety of household types. Experience has demonstrated that a cross-section of occupancy is an essential ingredient in creating economically viable housing as well as a healthy social environment. It is recognized by the Committee that existing public housing in many of our largest cities has become a concentration of very poor families and often predominately of families receiving public assistance. The provisions of this Act make it possible to develop new public housing with a cross section of low income families. At the same time, it is clear that steps must be taken to alter the occupancy in existing public housing to achieve a similar cross-section of occupancy. It is the intent of the Committee that the Secretary of HUD take appropriate steps to assist public housing agen-

cies to achieve this cross section of occupancy in existing public housing within a reasonable time period. *However, the Committee does not approve the imposition of occupancy requirements which have the effect of denying admission to any family on the basis that its income is too low.* S.Rep. No. 693, 93d Cong., 2d Sess. 40 (1974), *reprinted in* 1974 U.S. Code Cong. & Admin. News 4273, 4311 (emphasis added). When a very low income family, whose name is on a waiting list and which otherwise would be selected to occupy the next available apartment in a public housing project, *is skipped over in favor of a* family with higher income, the poorer family is in effect denied admission on the basis that its income is too low. It is thus apparent to me that, on the basis of the above-quoted report, Congress—or at least the Senate committee which drafted the bill—disapproved of the very skipping practice involved here as a method for achieving an economic mix in public housing.

In the face of this expression of congressional intent, the question on appeal is, I believe, whether HUD and Corcoran, in exercising their discretion to implement the facially ambiguous language of section 1437d(c)(4)(A), were free to choose skipping as a tenant selection procedure. This question is a difficult one, but, at least in the present context of reviewing a preliminary injunction, I am satisfied that the answer is HUD and Corcoran were not free to choose skipping.

In setting out the reasons for my conclusion, it is important to emphasize that the question I have posed is not one confronted head-on by the majority. In discussing HUD's regulatory authority in section V.A. of its opinion, for instance, the majority notes that HUD's regulations can be set aside only if they "exceed the statutory grant or are arbitrary capricious or an abuse of discretion." Then, without discussion, the majority states: "We see no such problems here." Maj. op. at 567. Discussion of the legislative history, as it impacts on HUD's choice of a method for achieving economic mix, is relegated to a series of footnotes in the latter part of the opinion.

In one footnote, the majority dismisses the whole idea of distinguishing between the *goal* of achieving an economic mix and the *method* of achieving that goal. "This is a distinction without a difference," the majority states, because preventing HUD from employing any method "would be a revocation of some of the authority granted to the Secretary in section 1437d(c)(4)(A)." Maj. op. at 569 n. 12. The majority has, of course, assumed its own conclusion by treating as incontestable the idea that section 1437d(c)(4)(A) authorizes skipping. Two things are evident to me: section 1437d(c)(4)(A) says nothing about skipping; and the legislative history of the section disapproves it.

To support its dismissal of the goal/method distinction, the majority offers only HUD's unsubstantiated assertion that skipping *must* be authorized by section 1437d(c)(4)(A) because it is the *only* way to "assure" that an economic mix is achieved "within a reasonable time." *Id.* But HUD's own regulations belie this assertion. HUD's current "standards for PHA tenant selection criteria," for instance, provide that PHA's shall collect certain information about likely tenants and, "[u]tilizing [this] information, develop criteria, by preference *or otherwise*, which will be reasonably calculated to achieve the basic objective" of economic mix. 24 C.F.R. § 960.205(c)(8) (1987) (emphasis added). If "or otherwise" has any meaning, I assume it means that there are selection criteria, other than preferences for higher income families, which can achieve an acceptable economic mix. While not attempting to exhaustively list such alternative selection procedures, I assume they would include, as plaintiffs suggest, efforts to broaden the diveristy of the applicant pool through promotional activities. With an economically-diverse pool, the housing agency could select names in order off the waiting list and still achieve a mixed-income tenant population.

Moreover, HUD's first post-OBRA regulations on tenant selection policies, released on May 21, 1984, as "final regulations,"

specifically forbade skipping over very low income families. Under that version, 24 C.F.R. § 960.204(b) provided that tenant selection

> policies and procedures shall be designed to ... attain, within a reasonable period of time, a tenant body in each project composed of families with a broad range of incomes and rent-paying ability that is generally representative of the range of incomes of lower income families, *but families whose incomes are between 50% and 80% of area median income shall not be given a priority by virtue of their income.*

49 Fed.Reg. 21492 (1984) (emphasis added). HUD obviously believed at that time that failing to allow low income families (families with incomes between 50% and 80% of median) to skip over very low income families (families with incomes less than 50% of median) would not impossibly frustrate the income-mixing goal. Moreover, even when HUD rescinded the antiskipping rule in the guise of a technical correction,[1] it did so in order "to remove language included erroneously in § 960.204 which might preclude otherwise appropriate means of implementing the [income mix] requirements of § 960.205(c)." 50 Fed.Reg. 9269 (1985). Contrary to its position here, then, HUD has acknowledged that a variety of means exist to achieve the goal of mixed-income tenant populations.

HUD's assertion that skipping is the only method which will achieve a satisfactory mix within a "reasonable time" is equally unpersuasive. "Reasonable time" is by nature a flexible and not a rigid term—it connotes a desire to achieve the income-mixing goal over a period of time, but not necessarily to do so in the most expeditious manner conceivable.[2] But that is exactly how HUD would have this court read the statute's timeliness requirement for, short of actually evicting very low income tenants in favor of low income tenants—something which HUD argues is almost impossible to do—the most drastic means available of achieving an economic mix is skipping over otherwise qualified very low income families when filling a vacancy.

Having rejected the goal/method distinction in one footnote, the majority dismisses the legislative history underlying the 1974 Act in another. In the midst of its discussion of the 1981 OBRA amendments, the majority quotes in the text two sentences from the same 1974 Senate Report I set out above—sentences which describe the rationale behind economic mix in public housing. Maj. op. at 570–71. Referenced to this quote is footnote 14, where the majority discusses that part of the report dealing with how a mix of incomes is to be achieved. There, the majority first chides plaintiffs for citing to only a portion of the report, which reads: "public housing authorities will continue to give particular attention and priority to very low income families." Taken in context, the majority states, this language does not show a *strong* disapproval for the Chad Brown income-mixing scheme.

Second, apparently disregarding its own advice about considering the committee statements in context, the majority dismisses as inapposite what I consider to be the *most* relevant statement in that report: "However, the committee does not approve the imposition of occupancy requirements which have the effect of denying admission to any family on the basis that its income is too low." Despite the fact that this sentence appears in the midst of a discussion about how to achieve a mix of incomes, the majority says that it refers not to skipping or other preference schemes, but to admission criteria that would act as an absolute and permanent bar to admission for certain classes of families. I recognize that such an absolute bar would be improper and that HUD has so provided in its regulations. *See* 24 C.F.R. § 960.204(c)(1) (1987). But I do not believe that the committee's refer-

---

**1.** As the majority notes in footnote 15, plaintiffs have challenged this rescission as a violation of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* I agree with the majority that plaintiffs' APA claim is not properly before us now.

**2.** HUD's regulations mandate that tenant selection criteria "shall be sufficiently flexible to assure administrative feasibility." 24 C.F.R. § 960.205(c)(8) (1987).

ence to policies "which *have the effect* of denying admission to any family," in the context of a discussion of economic mix, can be said to pertain to absolute bars and not skipping. As the record makes clear, the demand for public housing far exceeds the supply, and vacancies arise seldomly in the normal course. Denying a family access to a particular vacancy through skipping thus may entail denying them access to public housing altogether for a substantial period. The majority's overly technical distinction between delay and denial serves only to frustrate Congress's obvious desire not to keep poor families out of public housing on the ground that they are too poor.[3]

My interpretation of the committee's statement is, I believe, borne out by the Conference Report prepared in conjunction with the 1981 OBRA amendments. As the majority notes, for present purposes the central element of the 1981 OBRA amendments was the addition of 42 U.S.C. § 1437n. Section 1437n establishes income eligibility requirements for both section 8 housing and public housing, and reserves the "lion's share" of both for very low income families like the plaintiffs in this case. *See* Maj. op. at 564. The relevant portion of the Conference Report accompanying section 1437n—some of which is also set out in the majority opinion—bears repeating here. This portion appears in a section of the Conference Report entitled "Economic Mix in Assisted Housing Programs," a section which attempts to reconcile the adopted House version of the bill with an unadopted Senate version containing some additional provisions. One of those unadopted provisions would have deleted the income-mixing mandate of section 1437d(c)(4)(A). The Conference Report reads:

The conference report does not contain these [Senate-sponsored] provisions. However, given the changes in income eligibility required by this conference report, the conferees direct the Secretary of HUD to rescind the [income eligibility regulation for individually-owned assisted housing]. The conferees are also concerned that in carrying out the policy of creating a mix of families having a broad range of incomes in assisted housing that *families whose incomes are between 50 and 80 percent of median not be given a priority for occupancy by virtue of their income.* In addition, the conferees do not intend that a community should be required to achieve the same distribution of incomes between lower income families living in assisted housing and lower income families living in the community at large. Such a rigid formula can inhibit a community from fulfilling the basic purpose of the assisted housing programs without delay—to aid lower income families in obtaining a decent place to live.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 695 (1981), *reprinted in* 1981 U.S. Code Cong. & Admin. News 1010, 1054. This report makes three things clear about the intent of Congress: (1) an eligible family should not be permitted to skip[4] over another on the basis that it has a higher income, (2) income-mixing requirements are to be administered flexibly and not rigidly, and (3) the primary purpose of public housing is to provide shelter for lower income families. In *Martinez v. Rhode Island Housing & Mortgage Finance Corp.,* 738 F.2d 21 (1st Cir.1984), this court recognized as much.

As already noted, I do not believe that *Martinez* is *controlling* here because that case concerned section 8 housing to which

---

**3.** As a fallback position, the majority offers the following: "Furthermore, to the extent (if any) these statements [in the Senate Report] show some congressional disapproval of a skipping policy, they do not outweigh Congress's explicit grant of authority in section 1437d(c)(4)(A)." Again, the majority is either assuming its own conclusion that section 1437d(c)(4)(A) authorizes skipping, or it is assuming that because HUD has authority to select some methods to

implement an economic mix plan, it has carte blanche to select any method whatsoever. I cannot accept either assumption.

**4.** Although the majority finds that "give a priority" is an ambiguous term, I have no trouble concluding that permitting one family to skip over another on a waiting list is, to say the least, to give that family a "priority."

the section 1437d(c)(4)(A) income-mixing requirements do not apply. But *Martinez* also analyzed the very OBRA amendment Conference Report here at issue, and it is thus certainly *relevant* to the present discussion. The following is the relevant excerpt from *Martinez*. It speaks in terms of section 8 housing, but, because the legislation and legislative history to which it pertains (section 1437n) apply equally to the kind of public housing at issue here, the words "public housing" might easily be substituted for the words "section 8 housing":

> The OBRA amendments and the accompanying legislative history evince a congressional intent against preferences for higher income applicants for section 8 housing. [The new income eligibility requirements] plainly demonstrate Congress's desire to focus the section 8 program on very low income families. To continue to grant a preference to low income applicants is at odds with this statutory policy. The legislative history of the OBRA amendments contains a very explicit statement that "families whose incomes are below 50 and 80 percent of median (low income families) not be given a priority for occupancy by virtue of their income."

738 F.2d at 25 (footnote omitted). The *Martinez* admonition not to sanction a preference scheme that "is at odds with ...

statutory policy" applies to this case as well.

Recently, Congress has spoken again and reiterated the broad anti-skipping theme of the OBRA amendments. The context was the Housing and Community Development Act of 1987, passed by the Congress in December of 1987 and signed by the President on February 5, 1988. The 1987 Act essentially makes technical amendments to the section 1437n income eligibility requirements by adding two new subsections.[5] One such amendment is a prohibition on policies that totally exclude non-very low income families. Section 1437n as amended does not refer to skipping, but both the Senate and House Committee Reports on the 1987 Act expressly deal with skipping and explicitly disapprove it. The Senate Report states:

> The Committee fully expects that public housing agencies and other owners will make reasonable efforts to find potential tenants with very low incomes *and will not by-pass prospective tenants with very low incomes in order to serve those with higher incomes if eligible households with very low incomes are awaiting admission.*

S.Rep. No. 21, 100th Cong., 1st Sess. 16 (1987) (emphasis added).

The House Report is even more emphatic:

---

**5.** Section 103 of Title I of the 1987 Act reads as follows:

(a) Implementation of Percentage Limitations.—Section 16 of the United States Housing Act of 1937 is amended by adding at the end the following:

(c) In developing admission procedures implementing subsection (b), the Secretary may not totally prohibit admission of lower income families other than very low-income families, and shall establish, as appropriate, differing percentage limitations on admission of lower income families in separate assisted housing programs that, when aggregated, will achieve the overall percentage limitation contained in subsection (b). The Secretary shall issue regulations to carry out this subsection not later than 60 days after the date of the enactment of the Housing and Community Development Act of 1987.

(b) Exemptions From Percentage Limitations.—Section 16 of the United States Hous-

ing Act of 1937 (as amended by subsection (a) of this section) is further amended by adding at the end the following new subsection:

(d)(1) The limitations established in subsection (b) shall not apply to dwelling units made available under section 8 housing assistance contracts for the purpose of preventing displacement, or ameliorating the effects of displacement, including displacement caused by rents exceeding 30 percent of monthly adjusted family income, of lower income families from projects being rehabilitated with assistance from rehabilitation grants under section 17 and the Secretary shall not otherwise unduly restrict the use of payments under section 8 housing assistance contracts for this purpose.

(2) The limitations established in subsections (a) and (b) shall not apply to dwelling units assisted by Indian public housing agencies.

However, the Committee is sensitive to the plight of people who are on long waiting lists for public and other HUD-assisted housing and *recognizes that it is fundamentally unfair to skip over applicants with lower incomes who have been on the waiting list for a longer period of time in order to admit higher-income families who have applied more recently. The Committee fully expects that PHAs and other landlords of any HUD-subsidized housing will not skip over families with lower incomes if there are eligible families with lower incomes who are waiting to be admitted.* The Committee expects that, in implementing this provision, HUD will prohibit PHAs and other landlords from engaging in such unfair practices. The Committee further intends that these and other statutory provisions intended to benefit families eligible for assisted housing shall be fully enforceable by applicants pursuant to the Administrative Procedure Act, Section 1983, and the implied cause of action doctrine. H.Rep. No. 122, 100th Cong., 1st Sess. 12–13 (1987) (emphasis added), 1988 U.S.Code Cong. & Admin.News, 3328, 3329.

The antiskipping message of the 1981 and 1987 reports is, I believe, consistent with the way I have interpreted the original section 1437d(c)(4)(A) income-mixing provision. The majority, on the other hand, finds the Conference Report to be "troubling" and representative of "schizophrenia" within Congress about public housing. Rather than reconcile the 1981 and 1987 reports with the 1974 Act, the majority treats them as additional chapters in "an ongoing struggle in Congress as between granting priority to those families with the lowest incomes and providing for a mix of incomes." Maj. op. at 570. The issue thus becomes, for the majority, whether the OBRA Conference Report or the 1987 reports can be said to "override or modify the [1974] statute itself," and whether they "manifest Congress's affirmative intent to repeal a policy and a grant of regulatory authority set out in a statute." Maj. op. at 571. Relying on a recent decision of the District of Columbia Circuit, and especially

a concurrence to that opinion, the majority concludes that the reports cannot carry such weight. *See International Brotherhood of Electrical Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697 (D.C.Cir. 1987); *id.* at 715–20 (Buckley, J., concurring). Disagreeing with the majority's analysis, I cannot concur in its result.

To begin with, *International Brotherhood* is inapposite here. That case involved the issue of whether legislative history set down in conjunction with an amendment that *did not pass* could be applied retroactively to limit an agency's discretion under a preexisting statute. The holding of the court was a simple one: the legislative history could not be applied retroactively because "courts have no authority to *enforce* principles gleaned *solely* from legislative history that has no statutory reference point." *Id.* at 712 (emphasis in original). The facts in *International Brotherhood* are altogether different from those in this case. First, the most relevant legislative history here is that in the 1974 Senate Report, a document which surely has a "statutory reference point" since it accompanied and purported to interpret the very statute at issue here—section 1437d(c)(4)(A). Second, the 1981 Conference Report also accompanied a new statutory provision—more stringent limits on the number of families other than very low income families which could reside in public housing—and thus provides insight into Congress's intent in passing that provision. To be sure, the Conference Report also refers to a provision which would have eliminated the economic mix provisions for public housing and which was not passed. But in so doing, it does not repeal or amend the economic mix provision, as the majority contends, but rather gives an interpretation to that provision which is fully consistent with the 1974 report's interpretation. Finally, the 1987 reports also accompanied new legislation—amendments to the section enacted in 1981—and give an interpretation of section 1437d(c)(4)(A) which is consistent with both the 1974 and 1981 interpretations.

Even if *International Brotherhood* were indistinguishable from this case, I do not think it should be controlling here. The majority in this case neglects to mention that *International Brotherhood* was a radical departure from well-established precedent in virtually every other circuit. The Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits had all previously considered the same point of statutory construction addressed in *International Brotherhood* and reached a contrary conclusion. *See International Brotherhood,* 814 F.2d at 704, 709 n. 46 (citing cases); *St. John's General Hosp. v. NLRB,* 825 F.2d 740, 743 & n. 4 (3d Cir. 1987) (collecting cases). To justify this departure from the law of other circuits, the court in *International Brotherhood* could point only to one Supreme Court case where the Court said it was "hesitant to rely on ... inconclusive legislative history either to supply a provision *not* enacted by Congress, or to define a statutory term enacted by a prior Congress." *United States v. American College of Physicians,* 475 U.S. 834, 846–47, 106 S.Ct. 1591, 1598, 89 L.Ed.2d 841 (1986) (emphasis in original) (citations omitted). Without the same issue of statutory construction before this court, I am reluctant to give *International Brotherhood* a wholesale endorsement. Moreover, the majority's primary reliance here is not even on the holding in *International Brotherhood,* but on Judge Buckley's concurrence. I simply cannot ascribe such controlling weight in this circuit to a concurrence from an distinguishable case in another circuit which is itself at odds with the law of every other court of appeals to consider the issue.

Ironically, although it dismisses the explicit statements from some later Congresses on the basis of *International Brotherhood,* the majority *is* willing to *infer* pro-skipping sentiment from the action of *other* later Congresses. For example, the majori-

ty treats three amendments to section 1437d(c)(4)(A), which exempt from income-mixing certain kinds of housing *projects* and which grant preferences to certain classes of families,[6] as evidence of congressional acquiescence in skipping. *See* Maj. op. at 572 n. 18. I cannot follow the majority's logic. To begin with, given the excess demand and insufficient supply of public housing, even a non-skipping income-mixing scheme would inevitably cause some delays. It does not, therefore, imply acquiescence in skipping for Congress to exempt certain kinds of housing projects from such delays. Further, the fact that Congress granted preferences to some particularly poor families certainly does not imply that they also approved of skipping over other families on the ground that they are too poor. If anything, such preferences demonstrate that when Congress wanted to grant preferences, it did so explicitly. More importantly, in the face of the explicit and consistent anti-skipping views expressed since 1974 in legislative history, there is no need to embark on a search for inferences. Congress's view is clear.

Because this case involves a challenge to a HUD regulation, I think the merits of that challenge must be judged by the generally applicable Supreme Court standard: whether, in promulgating the regulation, "the Secretary exceeded his statutory authority or [whether] the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977) (quoting 5 U.S.C. § 706(2)(A), (C)); *see also Schweiker v. Gray Panthers,* 453 U.S. 34, 43–44, 101 S.Ct. 2633, 2639–40, 69 L.Ed.2d 460 (1981). I recognize, as does the majority, that section 1437d(c)(4)(A) expressly delegates to the HUD Secretary the power to prescribe standards for achieving an eco-

---

**6.** The majority incorrectly implies that the amendments simply "excuse" certain classes of families from ever having to participate in an income-mixing tenant selection system. Actually, the statute as amended only exempts from income-mixing projects and portions of projects devoted solely to elderly families. In addition, the statute provides that certain kinds of especially needy families will be given preferences in tenant selection systems which also seek to achieve a mixed-income tenant population. As the majority notes elsewhere, *see* Maj. op. at 566 n. 8, the plaintiffs in this action do not fall within any of these categories.

nomic mix, and thus that the HUD regulations involved here are "legislative rules" and not "interpretive rules." *See generally* K. Davis, *Administrative Law Treatise* § 7:8 (1979). As such, the regulations are generally entitled to "legislative effect" because the "Secretary, rather than [the] courts, [has] the primary responsibility for interpreting the statutory [provision]." *Schweiker*, 453 U.S. at 44, 101 S.Ct. at 2640 (quoting *Batterton*, 432 U.S. at 425). "A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner." *Batterton*, 432 U.S. at 425, 97 S.Ct. at 2405.

At the same time, courts cannot "abdicate review in these circumstances." *Schweiker*, 453 U.S. at 44, 101 S.Ct. at 2640. We must take seriously our obligation to ensure that the Secretary has "not exceeded his statutory authority," bearing in mind that " 'the reviewing court,' not the agency, 'shall decide all relevant questions of law.' " *Mayburg v. Secretary of Health and Human Services*, 740 F.2d 100, 105 (1st Cir.1984) (quoting 5 U.S.C. § 706). The Court has repeatedly admonished that, although according deference to administrative action, reviewing courts must not "slip into judicial inertia" or "rubberstamp" administrative decisions. *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965); *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)); *see also Mayburg*, 740 F.2d at 105 (collecting cases). In *Schweiker*, for instance, the Court, while acknowledging that the challenged regulation had "legislative effect," still felt compelled to review the legislative history of the authorizing statute to ensure that the regulation was consistent with congressional intent. I think that a similar course should be followed here and, as already stated, I believe the challenged regulation in this case is *not* consistent with the congressional intent underlying the income-mixing statute.

In *Mayburg v. Secretary of Health and Human Services*, 740 F.2d 100 (1st Cir. 1984), this court set forth a general framework for reviewing an agency's interpretation of a statute—an approach premised on the idea that before simply affirming an agency's exercise of discretion, "we must ask *why* courts should ever defer, or give special weight, to an agency's interpretation of a statute's meaning." *Id.* at 105 (emphasis in original). Two types of justification for deference were identified. First, the court must decide whether the agency has some specialized knowledge which would put it in a better position than the courts to know what Congress intended. In determining this, courts should look to: whether the question of interpretation is closely related to an area of agency expertise; whether the interpretation was set down near the time the statute was enacted and, if so, whether the interpretation has proved workable and been longstanding; and whether the interpretation has withstood a subsequent enactment of the statute. These factors do not persuade me that extraordinary deference is due here. Although HUD certainly has greater expertise than this court in deciding what tenant selection policies will achieve an economic mix, I have already noted that HUD's regulations belie the claim that skipping is the *only* effective method of achieving a mix. And while the skipping regulation involved here was enacted shortly after the 1974 Act, *see* 40 Fed.Reg. 33446 (1975), it has not been consistently followed, as evidenced by the initial post-OBRA regulations which forbade skipping. Additionally, the 1981 Conference Report and 1987 committee reports cast serious doubt on whether a regulation authorizing skipping, even if proper pursuant to the 1974 Act, should survive later amendments.

The second justification for deference identified in *Mayburg* is congressional intent that such deference be accorded. 740 F.2d at 106. This justification is a restatement of the distinction between "legislative rules" and "interpretive rules," the point being that "legislative rules" are entitled to greater deference precisely because Congress, through granting authority to pre-

scribe rules, so intended. In reviewing a challenged regulation, it is, therefore, important to glean from the statute and from the legislative history the degree to which Congress intended to confer open-ended discretion on the agency. *See* S. Breyer & R. Stewart, *Administrative Law and Regulatory Policy* 286 (2d ed. 1985) (construing *Mayburg*) (discussing factors that must be reviewed to determine "whether a 'legislative rule' is 'within the statute's authority'"). The fact that section 1437d(c)(4)(A) authorizes HUD to prescribe standards for income-mixing does not insulate from review the substance of every conceivable standard HUD might promulgate. If Congress intended that certain standards were not acceptable, HUD is not free to contravene Congress's intent through the exercise of congressionally-delegated discretion. Here, Congress incorporated one limit on HUD's discretion into the text of section 1437d(c)(4)(A): HUD is not permitted to prescribe standards which permit vacancies to exist in public housing when eligible tenants are on a waiting list. I believe that Congress clearly signalled disapproval of another standard—skipping —in the legislative history.

I am aware that others might find the legislative history in this case to be less clear than I have, and that courts in any event must be wary of providing judicial gloss to statutory provisions based on legislative history. *Cf. NLRB v. Wentworth Institute*, 515 F.2d 550, 555 (1st Cir.1975) ("It is, in any event, doubtful practice to exalt isolated glosses above statutory text."). Were the court compelled to issue at this time a final decision on the merits, this might be a difficult case. In the present posture of reviewing the propriety of a preliminary injunction, however, the court is not so compelled.

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limit-

ed purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than at a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing, and the findings of fact and conclusions of law are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary injunction stage to give a full judgment on the merits.

*University of Texas v. Camenisch*, 451 U.S. at 395, 101 S.Ct. at 1834; *see also LeBeau v. Spirito*, 703 F.2d 639, 642–43 (1st Cir.1983) (in reviewing preliminary injunction, court's findings "as to the merits of the case are not final but should be understood to be merely statements of probable outcomes based on the record as it existed before the district court"). Our task is simply to decide whether the granting of a preliminary injunction was an abuse of discretion. *Camenisch*, 451 U.S. at 393, 101 S.Ct. at 1832; *Brown v. Chote*, 411 U.S. 452, 457, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420 (1973); *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). In this case involving a close balancing of congressional intent and agency discretion, I find no abuse of discretion in the district court's action.

The majority in this case, however, does not apply an abuse of discretion standard. Despite the fact that both plaintiffs and defendants agree that such a standard is the proper one,[7] the majority says that, because the district court's legal reasoning was in some respects faulty, no deference should be accorded it. *See* Maj. op. at 574 (citing *Planned Parenthood*, 641 F.2d at 1009 ("It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of suc-

---

7. HUD's Reply Brief states: "Plaintiffs argue at great length that the proper standard of review in this case is that of abuse of discretion. We agree. However, in determining whether the district court abused its discretion in granting a

preliminary injunction, the Court must consider whether the district court applied the applicable law." HUD Reply Brief at 2 (citing *Camenisch*).

cess on the merits is never within the district court's discretion.")). Moreover, ignoring the Supreme Court's admonition in *Camenisch*, the majority *sua sponte* converts this preliminary injunction review into a full disposition on the merits: "In sum, we *find* that the Chad Brown income-mixing procedure meets the requirements of the HUD regulations considered in this opinion and that these regulations are within the authority granted to the Secretary of HUD under 42 U.S.C. § 1437d(c)(4)(A)." [8] Maj. op. at 573 (emphasis added). In *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 755–57, 106 S.Ct. 2169, 2176–77, 90 L.Ed.2d 779 (1986)—a case on which the majority relies to support its plenary disposition—the Supreme Court noted that there is an exception to the general *Camenisch* rule that courts reviewing a preliminary injunction will only review for an abuse of discretion and should not finally dispose of the merits. The Court identified a number of factors which help determine when the underlying merits of a preliminary injunction are "ripe for [final] review": whether the law is "clear"; whether final disposition would "save the parties the expense of further litigation"; and whether "the probability of success on the merits depends on facts likely to emerge at trial." 476 U.S. at 756–77 & n. 7, 106 S.Ct. at 2176 & n. 7. The majority never discusses why any of these factors render this an appropriate case for plenary review, but it seems to me that: even a final disposition of the issue before us will not end the current litigation because a number of other claims, including claims under the Administrative Procedure Act and the Fair Housing Act, remain to be resolved; the legal issues are not "clear," *see* Maj. op. at 569, 570 (characterizing the legislative history issues in this case as posing a "troubling question," a "roadblock" and a "dilemma"); and, because the parties have not requested a final disposition on the merits, they may seek in the district court to supplement the record

with regard to the very issue now before us.

Consistent with *Camenisch,* I believe that the district court's decision to enter a preliminary injunction is entitled to some deference, even though the legal conclusions underlying it were in part ill-founded. I also see no reason to reach out and decide the final merits at this preliminary stage. And, even if, like the majority, I were to consider *de novo* and finally determine the propriety of an injunction, I think the law supports the district court's decision to issue one. Accordingly, I move on to consider two other issues raised by HUD and Corcoran.

First, HUD argues that, even if plaintiffs have met the likelihood of success on the merits prong of the test for a preliminary injunction, plaintiffs have not established the other three requirements: (1) that plaintiffs will suffer irreparable harm if the injunction is not granted; (2) that plaintiffs' injuries outweigh any harm which granting the injunction would inflict on the defendants; and (3) that the public interest will not be adversely affected by the granting of the injunction. *See Planned Parenthood,* 641 F.2d at 1009. HUD's position seems to be that plaintiffs have utterly failed to present any proof regarding these three requirements, and thus that the district could not have found that the *Planned Parenthood* test was met. This argument is without merit. It is incontestable that the district court had before it evidence that three named plaintiffs were currently on the waiting list for housing at Chad Brown and were members of the very low income group which was subject to be skipped over if the HUD/Corcoran policy was carried out. It is also undeniable that, in issuing the preliminary injunction, the district court explicitly relied on the four-prong test set down in *Planned Parenthood,* and concluded: "Having reviewed the facts, federal statutes and their legislative history and case law, the Court is satisfied that all four criteria are met and

---

**8.** Although the majority finally decides the issue of whether "the Secretary exceeded his statutory authority," the majority opinion would not seem to preclude a later challenge concerning whether "the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *See Batterton,* 432 U.S. at 426, 97 S.Ct. at 2406.

therefore grants the motion for a preliminary injunction." I find no basis in the record for HUD's assertion that, despite this statement, the district court did not actually consider evidence relevant to three of these criteria.

In reviewing the irreparable harm, balance of interests, and public interest prongs, there can be no question that the abuse of discretion standard applies. *See* cases cited *supra*. There has been no such abuse here. The fact that two of the plaintiffs have previously been offered but refused an apartment in a different housing project is irrelevant. The record reveals that each time they refused, they were placed on the bottom of the waiting list; if they qualify to be on the waiting list, they certainly qualify to have their names selected from that list through a lawful procedure. Equally irrelevant is the fact that the plaintiffs may not be at or near the top of the list. No matter what number on the list the plaintiffs' names are now, each time a similarly-situated family above them on the list is skipped over (unless by someone also above the plaintiffs on the list), the plaintiffs are harmed by not progressing toward the top of the list. This harm is irreparable since, as HUD argues, it is "difficult, if not impossible to evict ... without good cause" tenants once they have been given housing. HUD Reply Brief at 14 & n. 10. Should plaintiffs eventually prevail in their claim that skipping is prohibited, their prospects for obtaining housing will still be permanently impaired by the effect of skipping during the pendency of this lawsuit. Given this potential for irreparable harm, I cannot say the district court abused its discretion in finding that harm to the plaintiffs outweighed any potential harm to HUD, Corcoran or the public interest in not being able to pursue, through questionable means, the goal of achieving "within a reasonable time" a mixed-income tenant population.

I now turn to HUD and Corcoran's final argument: that the district court improperly granted injunctive relief which will inure to the benefit of nonparties. HUD's claim is premised on the fact that the plaintiffs in this case have requested, but not yet been granted, class certification. Characterizing the district court's injunction as class-wide relief, HUD says that the district court's injunction is inconsistent with the lack of class standing. Nowhere, however, does the district court characterize its relief as classwide. Rather, the district court said that it was enjoining HUD and Corcoran's preferential scheme so that the *"[p]laintiffs* will be given a fair chance to be considered for such housing as Congress intended." (Emphasis added). The fact that, in order to grant complete relief to the plaintiffs, the entire skipping program had to be enjoined, does not mean that the district court improperly acted to protect nonparties. *See Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). The flaw in HUD's argument is its claim "that injunctive relief here may be provided to fully protect the named plaintiffs (*e.g.,* by providing that they not be skipped) without extending the injunction in any way to non-named putative class members." HUD Reply Brief at 14. As discussed above, the harm to plaintiffs here in *not* just the fact that *they* might be skipped over, but also the fact that families above them on the waiting list might be skipped over, preventing their progress up the list. Unless the injunction also protects families ahead of the plaintiffs, then, the harm to the plaintiffs cannot be avoided. The scope of the injunction was proper. *See Dionne v. Bouley,* 757 F.2d 1344, 1355–57 (1st Cir.1985) (district court may properly deny class certification where injunctive or declaratory relief in favor of named plaintiffs alone would necessarily inure to the benefit of the entire putative class).[9]

9. The only conceivable form of narrower relief which would fully protect the plaintiffs is an injunction that applies to plaintiffs and to all families ahead of them on the waiting list, but not to families below them on the list. In view, however, of HUD's steadfast assertion that even the plaintiffs will not progress to the top of the list during the period of the preliminary injunc-

For the foregoing reasons, I would affirm the district court's grant of a preliminary injunction.

tion, I see no need to modify the injunction along those lines.